## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) JAMES JANIS , AND** | § | |
| **(2) KEITH THOMAS,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Civil Action No.:** <u>4:20-cv-00193-TCK-JFJ</u> |
| **v.** | § | |
| | § | |
| **(1) JOSEPH EARLE;** | § | |
| **(2) GORDAN MCDOUGALL;** | § | |
| **(3) MARK LIVINGSTON;** | § | |
| **(4) UPPER STREET MARKETING, INC.;** | § | **JURY TRIAL DEMANDED** |
| **(5) LINEAR PARK MARKETING INC.;** | § | |
| **(6) GROWING SPRINGS HOLDINGS** | § | |
| **  CORPORATION; AND** | § | |
| **(7) PRIMAPHARMA, INC,** | § | |
| | § | |
| **Defendants.** | § | |

### COMPLAINT

Plaintiffs,   James Janis and Keith Thomas   ("collectively "Plaintiffs" or "Shareholders" or "Shareholder Plaintiffs") bring this complaint against defendants Joseph Earle ("Earle"), Gordon McDougall ("McDougall"), Mark Livingston ("Livingston"), Upper Street Marketing, Inc. ("UPPR"), Linear Park Marketing, Inc. ("Linear Park"), Growing Springs Holdings Corporation ("GSHC"), (collectively "Corporate Defendants"), and PrimaPharma, Inc. ("PrimaPharma"); and respectfully show the following:

### NATURE OF DERIVATIVE ACTION

1.       This is a shareholder derivative action brought on behalf of Nominal Defendant UPPR against Corporate Defendants by Plaintiffs who are, and at all times relevant hereto, UPPR shareholders. Plaintiffs, derivatively on behalf of UPPR, seek relief for the damages sustained, and that will be sustained by UPPR as a result of  Corporate Defendants' conversions, breaches of their fiduciary duties and Defendant Joseph Earle's wrongful refusal of Plaintiffs' well-grounded

©Brent Blackstock, PLC 2020

demand on the Board of Directors pursuant to Okla. Stat. tit 18, § 1065 to inspect and make copies and extracts of certain books and records of UPPR.

2.     Defendant Earle is UPPR's Director, President and Chief Executive Officer ("CEO").  He obtained this position by hijacking Growing Springs, LLC and integrating it into UPPR for his own benefit. As alleged below, Earle has availed himself of numerous opportunities to exploit UPPR through egregious instances of self-dealing, misrepresentations and false promises resulting in convoluted transactions where UPPR is robbed of its assets through transfers to a different Earle controlled entity. UPPR represented and promised millions of dollars in new business to run up the value of its stock. Insider stock sell offs occurred just as UPPR was being sold to one shell company after another, using as consideration worthless shares of UPPR's stock. Earle is not only the President and CEO of UPPR, but also the CEO of Growing Springs Holding Corporation, an acquiring entity of UPPR and the CEO of Linear Park. The record and schematic pattern in this regard is clear.

3.     Defendant Earle willfully disregarded his responsibilities to UPPR shareholders and permitted UPPR to function without sufficient internal controls, even after the SEC suspended trading on shares of UPPR. As a result of these deficiencies, UPPR: (i) suffered material losses, (ii) was exposed to substantial risk, (iii) was suspended by the SEC, (iv) was forced to enter into financial arrangements simply to remain viable from a position of weakness, and (v) lost potential revenue.

4.     Moreover, UPPR's reputation and goodwill has been irreparably damaged by the malfeasance and mismanagement of Earle. As a result of Earle's failure to deliver documents to Plaintiffs, his securities fraud, corporate waste, breaches of fiduciary duties, misrepresentations, and conversion, UPPR has suffered and stands to continue suffering harm.

## THE PARTIES

5.      Plaintiff Keith Thomas, an individual, is a current shareholder of UPPR and is a resident of the state of Georgia.

6.      Plaintiff James Janis, an individual, is a former employee and current shareholder of UPPR and is a resident of the state of Colorado.

7.      Defendant Joseph Earle, an individual, is a resident of the state of California in the City of San Diego.

8.      Defendant Gordon McDougall, an individual, is a resident of the city of Vancouver, Canada.

9.      Defendant Mark Livingston, an individual, is a resident of the state of California, in the City of San Diego.

10.      Nominal Defendant Upper Street Marketing, Inc. is an Oklahoma corporation that is registered to do business in California but is currently suspended in the state of Oklahoma due to its lack of compliance with certain Oklahoma tax requirements.

11.      Defendant Linear Park Marketing Inc. is a Nevada corporation having its principal place of business located in Arizona.

12.      Defendant Growing Springs Holdings Corporation is a Nevada corporation registered to do business in Colorado and having its principal office in California and principal office mailing address in Colorado.

13.      Defendant PrimaPharma, Inc. is a California corporation having its principal place of business located in San Diego, California.

## JURISDICTION AND VENUE

14.     Pursuant to 28 U.S.C. § § 1331 and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78aa, this Court has jurisdiction over the claims asserted herein for breach of fiduciary duty premised upon duties imposed and defined by federal law, including the Exchange Act, 15 U.S.C. § 78u-4(f).  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367. Further, the amount in dispute in this case far exceeds the jurisdictional requirements of this court, excluding interest and costs.

15.     Venue is proper in this Court under 28 U.S.C. § 139(a)(1) because defendant Upper Street Marketing, Inc. is an Oklahoma corporation.

16.     Pursuant to FED. R. CIV. P. 23.1, to the extent that this action is brought derivatively, it is averred that this action is not brought collusively to confer jurisdiction on a court of the United States it otherwise would not have. Furthermore, Plaintiffs have been unable to communicate with the director of the nominal defendant, Upper Street Marketing, Inc, because the director refuses to respond to any requests or attempts at communication from the Shareholder Plaintiffs.

## FACTUAL BACKGROUND

### A.  EARLE'S FRAUDULENT PLAN EMERGES

17.     On or about January 3, 2014, Upper Street Marketing, Inc. was formed by Gordon McDougall and incorporated under the laws of the State of Oklahoma. UPPR currently claims that it pursues opportunities in the Hemp and CBD markets.

18.     On or about September 20, 2017, Growing Springs, LLC ("Growing Springs") was formed under the laws of Nevada by Aziz Patel. Its purpose was to participate in providing water treatment technology to hemp and cannabis growers.

19.     In February 20, 2018, Earle was hired by Growing Springs.

4

20.     Sometime after being hired by Growing Springs, Earle, through misrepresentation and misinformation, forced Aziz Patel to relinquish his position with the company to Earle.  Then Earle developed a multi-part scheme (i) for his company, Growing Springs Holding Corporation ("Holding Corp."), to acquire Growing Springs, which then became a wholly-owned subsidiary of Holding Corporation and (ii) to have UPPR, a publicly traded shell company, acquire Holding Corp.  In so doing, Earle, through misrepresentations and manipulations, deceived the owners of Growing Springs, and effectively perpetrated a theft of their company when his company, Holding Corp., acquired Growing Springs, which he then used to acquire control of UPPR for his benefit ("Holding Corp. Transaction").  Until the second part of Earle's scheme had been consummated, Holding Corp. was solely owned by Earle, who also served and continues to serve as its President, Secretary, Treasurer and Director.

21.     On or about July 12, 2019, shortly after the Holding Corp. Transaction, Earle fired Aziz by calling Noorani Burstein, Aziz's mother, to tell her Aziz was fired and threatened his arrest if he appeared on Growing Springs property.

22.     The Holding Corp. Transaction was accomplished surreptitiously, not recorded in writing and through a trade of worthless shares in UPPR offered as consideration.

23.     On October 2, 2018, Earle was appointed as Director and President and Chief Executive Officer of UPPR. In or around this same time, Earle also became the CEO of Growing Springs Holding Corporation.

24.     In 2019, Earle, in his capacity as Chief Executive Officer of UPPR, devised a scheme to defraud potential investors. Earle proceeded to collect $6 million from investors by promising that UPPR would obtain a warehouse in Center, Colorado, would grow 1,200 acres of hemp, would acquire five industrial extractors, would raise institutional investment, would acquire

PrimaPharma, of which Mark Livingston is Chief Executive Officer, would have gross sales in excess of $100 million, and would dramatically increase shareholder value.

25.     Earle hired a third-party vendor called Project Growth owned by Stephen Bryant to raise money for UPPR, who then enticed investors based on false and misleading statements from UPPR and without current financial statements to support his statements. Bryant perpetuated Earle's scheme when he continued to trade in UPPR stock despite certain SEC restrictions imposed in June 2019.

26.     Currently, Earle allegedly owns 35 million shares of UPPR common stock and 10 million common stock purchase warrants for a total, if the warrants are exercised, of 45 million shares of common stock, making Earle the largest shareholder of UPPR. See **Exhibit A**, attached hereto, *Upper Street Marketing Inc. and Joseph Earle, Shareholder v. United States Securities and Exchange Commission,* Petition of Upper Street Marketing Inc. and Joseph Earle, Affidavit of Joseph Earle p. 4 at ¶ 15.

27.     On April 18, 2019, Earle claimed in a press release that UPPR had formed a "strategic partnership" with Catch Capital Partners, Inc. "to jointly develop cannabis and hemp production and extraction in Canada." On May 16, 2019, in a subsequent press release, Earle boasted that "UPPR embarked on an ambitious plan in 2018 to become the first and likely the largest cGMP CBD producer and marketing company in the United States." So far UPPR has produced no CBD. This "strategic partnership" cost UPPR 5 million shares of common stock and has resulted in no extraction of cannabis, hemp, or CBD whatsoever. See **Exhibit B**, attached hereto.

28.     Sometime in or about May 2019, UPPR, under Earle's control, entered into a contract to purchase a warehouse in Center, Colorado, to be financed by, among other things, two

promissory notes - the first, a Senior Secured Fixed Convertible Promissory Note in the initial principal sum of $550,000 in favor of a fund called Harbor Gates Capital, LLC, and the other, subordinated to the Harbor Gates Capital note, in the initial principal sum of $687,000 in favor of UPPR's hemp farmer, Roger Christianson. Both notes have been in default since at least early October 2019.

29.     In a press release it issued on or about May 28, 2019, UPPR claimed it had entered into an agreement ("Fox Agreement") with Fox Organic Farms ("Fox Farms") where it secured 1.5 million pounds of hemp for cannabidiol ("CBD") extraction. See **Exhibit C**, attached hereto.

30.     UPPR claimed the CBD isolates and distillates from the hemp in the transaction would have a value of "approximately $200 Million." To date, UPPR has not received even one dollar of revenue from the CBD in this agreement.

31.     UPPR continued to pump up market enthusiasm for its non-existent business activities. On June 5, 2019, UPPR made a corporate presentation at the 9th Annual LD Micro Invitational, which is a resource for the microcap stocks in North America with a market cap between $50 million and $300 million.

32.     At the LD Micro conference, UPPR made the following false claims, *inter alia*:

a.   UPPR owns and operates a 100,000 square foot facility for processing CBD from hemp in Center, CO;

b.   UPPR has leased a 12,000 [square foot] licensed CBD laboratory processing facility in San Diego, CA;

c.   "Growing Springs has secured proprietary and unique AAA cannabis and hemp genetics"; and

      d.   UPPR reduces or eliminates agricultural run-off. *See* attached **Exhibit M,** PowerPoint pages 6 &11)**.**

Regarding the statements – in (a), the "processing" facility was in actuality an empty warehouse with no extraction equipment; in (b), the facility in San Diego was also an empty building with no equipment; in (c), UPPR does not and never has owned proprietary genetic stock or seeds; and in (d), UPPR does not have the capability to reduce or eliminate agricultural run-off.

      33.     On or about June 18, 2019, UPPR claimed to have "planted its first 1,200 acre hemp cultivation for which UPPR projected a $200 million revenue stream." The crop was supposed to have been ready for harvest 16 weeks later, *i.e*., by October 8, 2019. In reality, the size of the acreage was only 1,170 with only 270 acres of harvest solely owned by UPPR.  Nine hundred acres were leased by Fox Farms under the Fox Agreement with UPPR, based upon extraction totals. To date, no extraction has occurred, and Fox Farms has never been paid for its harvest.

      34.     Mismanagement, over-payment to the harvesters, misrepresentations of the harvester's capabilities and lack of supply chain to move and properly process the hemp resulted in a loss on this harvest. The $200 million revenue stream never happened.

      35.     On or about June 24, 2019, according to a UPPR press release issued by Earle, UPPR finalized a multi-million dollar equipment order to acquire "state-of-the-art extraction systems from ICC Group (https://www.icc-inc.net) [("ICC")] designed to process up to 2 million pounds of raw hemp biomass a year into 120,000 liters of crude cannabidiol (CBD) free from psychoactive contaminants." According to Earle, "Executing this agreement puts us on track to start converting raw hemp into CBD distillates and concentrates within the next 120 days." See **Exhibit D**, attached hereto.

36.     The transaction was never completed. Because of a lack of available financing, UPPR failed to make the purchase of the "state-of-the-art extraction systems" from ICC, and 120 days after the press release, *i.e.*, by October 22, UPPR still had no equipment to process the hemp and had extracted no CBD distillates and concentrates.

37.     By June 26, 2019, all investors, including Plaintiffs, had raised approximately five million dollars ($5,000,000) for UPPR.

38.     On or about June 26, 2019, UPPR issued another fraudulent press release. First it claimed that it had a "1,200-acre hemp crop in the ground and moving toward harvest." It claimed it would purchase three million dollars ($3,000,000) of additional grow equipment from Fox Farms in exchange for common shares in UPPR to the seller. This grow equipment included 100,000 watts of greenhouse lighting capacity supposedly allowing for seed and transplant production during the winter thereby allegedly increasing 2020 revenue projections to fifteen million dollars ($15,000,000).  See **Exhibit E**, attached hereto.

39.     In the same June 26, 2019 press release, Earle on behalf of UPPR proclaimed: "'Adding a winter cultivation to our calendar further expands our hemp business model and extends our 2020 revenue projections by at least $15 million,' said UPPR CEO Joseph Earle. 'If you were wondering what we would be doing after our projected first $200 million harvest at the end of the third quarter, this is it.'" This statement was false.  In reality, the equipment was ***not*** winter growing equipment.

40.     On June 27, 2019, the Securities and Exchange Commission issued a Suspension Order that suspended trading in UPPR's common stock between "9:30 a.m. EDT, on June 28, 2019, through 11:59 p.m. EDT, on July 12, 2019" ("SEC Suspension Order") because of:

> questions about the accuracy and adequacy of information publicly disseminated concerning UPPR, including, among other things: (1) public statements by UPPR

dated May 8, 2019 and May 23, 2019 concerning $10.55 million worth of purported financing for UPPR; (2) public statements by UPPR dated April 30, 2019 and May 23, 2019 denying its retention of an investor relations firm despite apparent possible promotional activity on behalf of UPPR; and (3) inadequate statements, since at least November 2018, concerning a possible private offering of at least $3 million dollars [sic] in UPPR's common stock.

The SEC Suspension Order was entered pursuant to Section 12(k) of the Exchange Act. See **Exhibit F**, attached hereto, Securities Exchange Act of 1934, Release No. 34-86228 / June 27, 2019.

41.      In or around this same time, OTC Markets Group Inc. ("OTC Markets") announced that it had discontinued to display bid and asked quotes of UPPR's common shares and had labeled UPPR "Caveat Emptor" ("buyer beware").



OTC Markets designates certain securities as Caveat Emptor and places a skull and crossbones icon next to the stock symbol to inform investors that "[t]here is a public interest concern associated with the company, which may include a spam campaign, questionable stock promotion, known investigation of fraudulent activity committed by the company or insiders, regulatory suspensions, or disruptive corporate actions." See **Exhibit G**, attached hereto.

42.      Unfortunately, this warning came too late for the Plaintiffs.

43.      UPPR attempted to address the inaccurate and inadequate information as referenced in the SEC Suspension Order as cited in ¶ 39. The suspension expired and UPPR's trading resumed

on the Gray Market only, but OTC Markets did not reinstate quotations of UPPR's common stock on the "Pink Sheets" or remove the Caveat Emptor warning.

44.    Because of the SEC Suspension Order, UPPR never acquired any equipment from Fox Farms. Fox Farms kept its seed and clone equipment upon the publication of the SEC Suspension Order. At this time,  the shares of UPPR common stock that were to have been issued to Fox Farms became valueless.   Again, mismanagement at UPPR resulted in lost potential revenue.

45.    Upon information and belief, UPPR's attempted "transaction" with Fox Farms was memorialized in a non-binding agreement.   Fox Farms owned 500,000 pounds of biomass produced from 900 acres of hemp.   All that UPPR would own would be the extracted CBD distillates and concentrates, of which Fox Farms would receive its 50% share of revenue upon sale of the extracted product.   Since no extraction has occurred, Fox Farms, upon information and belief, is seeking another extraction company for its 500,000 pounds of biomass.

46.    Neither of the potential transactions between UPPR and Fox Farms was divulged to the shareholders of UPPR.

### B.  UPPR CONTINUES TO ATTEMPT TO ENTER INTO FRAUDULENT TRANSACTIONS

47.    On or about July 8, 2019, UPPR announced that it signed a Letter of Intent to acquire an 80% interest in the FDA-licensed pharmaceutical manufacturer, PrimaPharma, to oversee and enforce hemp and CBD manufacturing standards. UPPR made the announcement that UPPR would acquire PrimaPharma for three million dollars ($3,000,000). This acquisition never closed due to UPPR's lack of success and inability to raise the money to purchase PrimaPharma. See **Exhibit H**, attached hereto.

48.     In anticipation of the acquisition of PrimaPharma, UPPR rented a 13,000 square foot laboratory and manufacturing facility next to PrimaPharma in San Diego for $15,000 per month to use for producing CBD isolates and distillates. This facility has not been utilized by UPPR, and remains empty as of the filing of this Complaint.

49.     On or about July 8, 2019, upon information and belief, an individual or entity sold 800,000 shares of UPPR's common stock when the stock was quoted at $2 per share. These UPPR shareholders controlled shares of unrestricted common stock obtained from previous persons associated with UPPR when it was a shell company. This sale transaction was part of a "pump and dump" transaction.  The press releases constituted the "pump" and the sale transactions constituted the "dump," which reduced the quoted value of shares of UPPR common stock for all of the other shareholders  from $2 per share to approximately $1.20 per share.

50.     In August of 2019 Earle negotiated a transaction to purchase five industrial extractors from ICC. Earle paid for the transaction with a $1,500,000 deposit on August 1, 2019 and a $3,300.000 million loan that supposedly was to be provided by NFS group, an equipment finance company. ICC ultimately financed the purchase transaction in December but not through NFS. The specific details of this transaction were not shared with the UPPR shareholders. The five industrial extractors were never delivered. It is unclear what happened to the $1,500,000 deposit or to the five apparently undelivered industrial extractors. Despite the fact that the extractors were never delivered, UPPR, upon information and belief, is being invoiced by ICC for approximately $50,000 per month.

51.     On or about September 17, 2019, a shareholder traveled to Center, Colorado to inspect the fields of the first hemp harvest and discovered that Earle's crop planting was a disaster.

Earle was in charge of all aspects of UPPR's planting and had implemented substandard farming practices.

52.     Earle chose to plant a combination of both male and female seeds, which yielded a smaller crop with a lesser CBD count than would have been possible had he chosen to plant only female seeds.

53.     Additionally, harvesting a hemp crop is labor-intensive. It involves manual labor with individuals cutting each plant by hand. To further cut expenses, Earle chose to harvest the crop with a machine, hurting the crop and its potency. Because of Earle's lack of due diligence in learning proper hemp farming techniques, UPPR's shareholders sustained millions of dollars in losses.

54.     On September 21, 2019, in a "shareholder meeting" produced on YouTube, Earle asked the UPPR shareholders for $700,000 to complete the harvest. Earle claimed he had to pay a vendor referred by Fox Farms. However, the vendor, Harvest Right LLC, only charged approximately $450,000 to complete the harvest or $1500 per acre for a custom harvest of 270 acres of hemp. The Plaintiffs received no information about what was done with the extra $250,000. See http://upperstreetmarketing.com/2019/09/30/investor-report-with-joseph-earle/.

55.     On or about November 26, 2019, UPPR falsely announced it had harvested 2 million pounds of  biomass, which would be stored in its warehouse in Center, CO. UPPR's farmers only harvested approximately 800,000 pounds of biomass, of which only 300,000 pounds were owned, unencumbered, by UPPR. See **Exhibit I,** attached hereto.

56.     On or about December 9, 2019, UPPR claimed it had completed the ICC transaction, whereby it was to acquire five "hemp biomass extraction modules" that supposedly were able to extract CBD from hemp.  UPPR claimed that "financing has been successfully

completed." The modules were supposed to be "in action within 3-4 weeks of delivery." Originally, the modules were to be delivered in or around October or November 2019; but because financing was not arranged in time, the delivery of the modules was delayed to April 2020 and has continued to be delayed. Upon information and belief, none of the modules has been delivered. See **Exhibit J,** attached hereto.

57.     The biomass, a perishable good, remains in storage and unprocessed. The biomass loses 1% of its potency each month it remains in storage and unprocessed.  This loss of potency results in lost revenue for UPPR each month.

### C. UPPR PURPORTS TO SELL ALL OF ITS ASSETS TO LINEAR PARK, LEAVING UPPR SHAREHOLDERS WITH NO VALUE

58.     On February 6, 2020, Earle furthered his plan to swindle the shareholders of UPPR. Since trading in UPPR shares of common stock on the over-the-counter market had been suspended by virtue of the SEC Suspension Order, Earle needed another shell company to continue his fraudulent scheme.

59.     Without prior announcement to UPPR's shareholders, Earle entered into a letter of intent (and, upon information and belief, a definitive agreement) with Linear Park for it to acquire the purported assets and certain stated (but not yet disclosed to UPPR's shareholders) liabilities of UPPR for shares of capital stock of Linear Park (the "Linear Park Transaction"), of which Earle is Chief Executive Officer.

60.     Upon information and belief, Linear Park is a shell company without any material assets. If the pending Linear Park Transaction with UPPR were to be consummated, Linear Park would acquire the purported assets and certain stated liabilities of UPPR and UPPR would be issued certain shares of Linear Park's capital stock, the amount of which has not yet been disclosed to UPPR's shareholders.

14

61.     If the pending Linear Park Transaction were to be consummated, the status of the UPPR shareholder ownership would change from UPPR shareholders owning all of the capital stock of UPPR (an enterprise that Earle asserts "plan on being able to grow and process up to 1,000,000 pounds of bio-mass in 2019…generat[ing] up to a target of $60,000,000 of revenues[1]") to, upon information and belief, the UPPR shareholders owning a diluted interest in Linear Park, whose only assets would be the self-same purported assets that UPPR claimed to own immediately prior to the consummation of the pending Linear Park Transaction.

62.     The next step in Earle's scheme was to cause Linear Park to enter into a transaction with Dynamo Capital Corp. ("Dynamo"), a company, whose common shares are traded on the Canadian TSX Venture Exchange.  Dynamo describes itself as ". . . a capital pool company created to identify and evaluate potential acquisitions of commercially viable businesses and assets that have the potential to generate profits and add shareholder value. Except as specifically contemplated in the CPC policy of the exchange, until the completion of its qualifying transaction, Dynamo will not carry on business, other than the identification and evaluation of companies, businesses or assets with a view to completing a proposed qualifying transaction." This announced potential transaction constitutes Earle's attempt to evade the trading restrictions that resulted from the SEC Suspension Order that suspended public trading of UPPR's common stock. *See* **Exhibit L,** attached hereto.

63.     At the same time that the Linear Park Transaction was being announced, UPPR also entered into an agreement with Victory Americas Group, LLC ("Victory") to process the hemp biomass into CBD Distillate and pay UPPR from the sale of the distillate, but upon information and belief, no processing of the biomass has occurred.

---

[1] *See* http://upperstreetmarketing.com/investors/, visited on May 4, 2019 at 5:45 p.m. CST.

64.     To date, Earle's scheme to swindle the assets of UPPR has caused trading in UPPR's common stock to be suspended by the SEC due to its concerns regarding the adequacy and accuracy of Earle's publicly released statements regarding UPPR and his inability to resolve these issues with the SEC.

65.     Earle failed to raise sufficient investment for UPPR due to his incompetence.

66.     Earle failed to generate any significant sales from UPPR's biomass which remains stored in a warehouse since November 2019.

67.     UPPR, under Earle's leadership, failed to acquire PrimaPharma as promised.

68.     Earle caused trading in UPPR's common stock to be suspended due to the SEC's concerns regarding the adequacy and accuracy of his publicly released statements regarding UPPR and his inability to resolve these issues with the SEC.

69.     UPPR, under Earle's management, defaulted on the promissory notes to purchase the Center, Colorado warehouse.

70.     UPPR, under Earle's management, defaulted on a $250,000 promissory note to Soil Solutions, Ltd. owned by David Max Powers.

71.     UPPR, under Earle's management, defaulted on a $25,000 promissory note to Black Swamp AG Inc. owned by Scott Apple.

72.     Now, in order to escape UPPR's debt that Earle generated and his lack of success in operating UPPR and his violation of his fiduciary duties to UPPR's shareholders, Earle and Livingston (i) entered into the pending Linear Park Transaction scheme, to be followed by (ii) Linear Park's pending acquisition of PrimaPharma, which would be followed by (iii) the resulting UPPR/Linear Park/PrimaPharma company entering into a non-arm's-length transaction with a Canadian "Capital Pool Company" (*i.e.*, a shell company) that was traded on the Canadian Stock

Exchange, the Toronto Stock Exchange, or, in the current case of Dynamo, on the TSX Venture Exchange.

73.    On April 2, 2020, Noorani Burstein, as an UPPR shareholder, issued a demand letter under OKLA. STAT., tit. 18, § 1065 to UPPR (the "Demand Letter"). See **Exhibit K,** attached hereto. The Demand Letter delineates her concerns as a UPPR shareholder (noting that this is not an exhaustive list), as follows:

    a.  UPPR has not held a shareholders meeting in the past year, if ever;

    b.  UPPR has not updated its OTC Markets information since July 12, 2019; and

    c.  UPPR may have initiated, entered or closed various material transactions.

74.    Noorani on behalf of the shareholders demanded the following:

    a.  that UPPR and its management permit exercise of statutory inspection and copying of:

        i.  UPPR's stock ledger, list of shareholders, books and records;

        ii. the books and records of UPPR's wholly owned subsidiary, Growing Springs Holding Corporation; and

        iii. the books and records of any other unnamed wholly owned or majority owned consolidated subsidiaries.

75.    The Demand Letter required a response on April 10, 2020 according to OKLA. STAT. tit. 18, § 1065(C).

76.    Despite receiving a vitriolic letter in response, none of the shareholders, nor the Plaintiffs have received access to any records from UPPR or the other subsidiaries.

<u>CAUSES OF ACTION</u>

**A. FAILURE TO DELIVER DOCUMENTS**

77.    Plaintiffs re-allege and incorporate each and every allegation above as though fully set forth herein.

78.    This is a cause of action brought pursuant to OKLA. STAT. tit 18, § 1065 ("Section 1065") to enforce Plaintiff's statutory right to inspect and make copies and extracts of certain books and records of defendant UPPR.

79.    Plaintiffs are shareholders of defendant UPPR. As set forth above, Plaintiffs initiated a Section 1065 request on UPPR for certain books and records regarding the financial records of UPPR and its subsidiaries or sister companies.

80.    Defendant Earle has not allowed the shareholders access to the records.

**B. MANDATORY PRELIMINARY INJUNCTION**

81.    Plaintiffs re-allege and incorporate each and every allegation above as though fully set forth herein.

82.    UPPR has never held  any shareholders meetings and no date has been designated for the next annual meeting. There has never been a written consent to elect directors in lieu of an annual meeting by shareholders.

83.    Plaintiffs request that the Court enter a mandatory preliminary injunction forcing a shareholder meeting to allow the shareholders to appoint new directors and officers, because Plaintiffs have a substantial likelihood of success on the merits, irreparable injury will result if such relief is not granted, the injury to Plaintiffs far outweighs any injury to Defendants, and the injunction is not contrary to public policy.

84.     Pursuant to OKLA. STAT. tit. 18, § 1056(c), Plaintiffs respectfully request that the Court enter a mandatory injunction against Defendants, summarily ordering a meeting of shareholders to be held, the record date for determining the shareholders entitled to vote and the form of notice of the meeting.

### C.  ACCOUNTING

85.     Plaintiffs re-allege and incorporate each and every allegation above as though fully set forth herein.

86.     Plaintiffs continually attempted to inspect the books and records of UPPR since July 2019, and as recent as February 2020.  At that time, Plaintiffs requested complete access to all of the corporate books and records but were denied such access by Defendant Earle or agents of Earle.

87.     Plaintiffs request that the Court order an accounting of the business, finances, and transactions affecting UPPR and allow Plaintiffs to inspect the books and records of the other Defendant companies.

### D.  SECURITIES FRAUD

#### a.  SECURITIES ACT SECTION 12(1)

88.     Plaintiffs re-allege and incorporate each and every allegation above as though fully set forth herein.

89.     Pursuant to representations made by Defendant Earle, Plaintiffs invested substantial sums of money into shares of UPPR expecting to receive a reasonable return on their investments.

90.     The acts described herein involved the purchase and sale of (securities) within the meaning of Section 12(1) of the Securities Act and Section 3(a)(10) of the Exchange act by means of oral communications, by the use of the mails, and by the use of the means and instrumentalities

of interstate commerce. Because UPPR is an Oklahoma corporation, the sales of these securities occurred in Oklahoma.

91.     Defendants Earle and UPPR participated in the offer and sale of these securities.

92.     Earle, with intent to induce Plaintiffs to purchase shares of UPPR, made false and misleading statements and is a primary violator of the actions complained of in this count.

93.     The securities offered and sold by Defendants Earle and UPPR to Plaintiffs were offered and sold by Earle in violation of Section 12(1) of the Securities Act.

94.     Plaintiffs have been required to employ an attorney to prosecute this action and are entitled to recover damages and attorney's fees and costs.

b.     SECURITIES ACT SECTION 12(2)

95.     Defendants Earle and UPPR engaged in manipulative activities and fraudulent courses of conduct in regard of their sale of securities to Plaintiffs.

96.     The foregoing misrepresentations and omissions concern material facts which were made in or omitted from oral communications from Defendants Earle and UPPR to Plaintiffs in connection with the purchase of securities from Defendants Earle and UPPR.

97.     At the time Plaintiffs purchased securities from Defendants Earle and UPPR, Plaintiffs did not know the untruth of the facts misstated.  Therefore, Defendants Earle and UPPR violated Section 12(2) of the Securities Act in connection with their sale of these securities to the Plaintiffs.

98.     Plaintiffs are entitled to damages in excess of $75,000, interest and reasonable attorney's fees and costs for the violation of Section 12(2) of the Securities Act.

E.  REPLACEMENT OF MANAGEMENT

99.     Plaintiffs re-allege and incorporate each and every allegation above as though fully set forth herein.

100.    As noted in Cause of Action A, there have been no shareholder meetings nor have shareholders been allowed to view UPPR financial books and records. As such, Plaintiffs and other shareholders request the Court to allow the shareholders to appoint new directors and new officers.

101.    UPPR has not filed with OTC Markets any annual or quarterly reports in connection with OTC Markets' Alternative Reporting Standards (collectively, "UPPR's Delinquent OTC Markets Reports").

102.    Because of the SEC Suspension Order, upon information and belief, FINRA will not currently permit any broker-dealer to provide bid or ask quotations for UPPR's Common Stock; and OTC Markets will not report any quotes for trading in UPPR's Common Stock, even if such trades were to occur on the "Grey Market" or the "Expert Market."  Following the release of the SEC Suspension Order, in order for a broker-dealer to provide bid or ask quotations for UPPR's Common Stock, such broker-dealer must successfully prosecute a Form 211 filing with FINRA.

103.    Upon information and belief, FINRA will not approve any Form 211 filings unless and until UPPR has filed all of UPPR's Delinquent OTC Markets Reports and the SEC investigation against UPPR (although not necessarily against Earle) has been concluded.  With the appointment of new officers and directors of UPPR and the filing of UPPR's Delinquent OTC Markets Reports, the SEC should conclude its proceedings against UPPR, which should permit a broker-dealer to obtain FINRA's approval of the requisite Form 211 and should cause OTC Markets to remove the "caveat emptor" designation of UPPR's Common Stock.

### F. CORPORATE WASTE

104.    Plaintiffs re-allege and incorporate each and every allegation above as though fully set forth herein.

105.    Earle committed waste when he allotted UPPR funds for substandard farming and when UPPR was charged exceedingly high costs for the poor farming and harvest of the hemp.

106.    Earle continued committing waste and self-dealing when he transferred all of UPPR's assets for no or little consideration into Linear Park, a company of which he is a shareholder.  This transfer further diluted the value of UPPR and provided no benefit to UPPR and its shareholders.

107.    As a result of the corporate waste alleged above, Earle is liable to Plaintiffs for damages.

### G. BREACH OF FIDUCIARY DUTY

108.    Plaintiffs re-allege and incorporate each and every allegation above as though fully set forth herein.

109.    Earle owed and continues to owe Plaintiffs the duties of good faith, loyalty, due care and candor in the management, administration, and oversight of UPPR's business and affairs.

110.    The conduct of Earle, as set forth herein, was due to his intentional, knowing or reckless disregard of the fiduciary duties owed to the Plaintiffs.

111.    Earle breached his fiduciary duties by willfully participating in and causing UPPR to unnecessarily waste corporate funds and failing to properly oversee UPPR's business and affairs which renders him personally liable to the Plaintiffs.  Further, by his breaches of fiduciary duties, Earle has subjected UPPR to substantial civil and regulatory liability.

112.     As a direct and proximate result of Earle's breaches of fiduciary duties, UPPR has experienced and will continue to experience significant harm. As a result of the wrongdoing alleged herein, Earle is liable to Plaintiffs.

### H.  NEGLIGENT MISREPRESENTATION

113.      Plaintiffs re-allege and incorporate each and every allegation above as though fully set forth herein.

114.     Corporate Defendants made negligent misrepresentations to Plaintiffs as delineated above.

115.     As a result of Corporate Defendant's negligent misrepresentations, Plaintiffs suffered damages in excess of $75,000.

### I.  VIOLATION OF OKLAHOMA SECURITIES ACT – OKLA. STAT. tit. 71, § 1-501

116.      Plaintiffs re-allege and incorporate each and every allegation above as though fully set forth herein.

117.     The actions of Earle in the offer and sale of securities to Plaintiffs were violative of the Oklahoma Securities Act.

118.     Earle violated certain provisions of the Oklahoma Securities Act, including OKLA. STAT. tit. 71, § 1-501 et al., as a result of schemes and artifices to defraud Plaintiffs by making untrue statements, omitting material facts, and engaging in acts practiced in the course of business which operated as fraud and deceit upon Plaintiffs.

119.     Pursuant to the Oklahoma Securities Act, Plaintiffs hereby tender any interest in the bank instrument or other securities to Earle, if the same exist, and Plaintiffs are entitled to recover the sum of not less than $75,000 with interest on such amount.

120.     Earle made multiple material, false representations and their actions were deceitful to Plaintiff. Earle was aware he was misstating material facts and omitting to state material facts to Plaintiffs. Further, Earle knew, or should have known, the Plaintiffs would rely on these representations.

121.     Plaintiffs expressly relied upon misrepresentations of Earle and the actions of Earle to Plaintiffs constituted fraud.

122.     The deceit and fraud perpetrated by Earle upon Plaintiffs was knowingly and willfully done by Earle with total disregard to the rights of Plaintiffs, who relied upon these misrepresentations.

123.     Earle's conduct offends public policy and is unfair and involves practices which are immoral, unethical, oppressive, unscrupulous, and unconscionable.   Accordingly, Plaintiffs request that they be awarded punitive and exemplary damages.

124.     In all circumstances, Earle's extensive unlawful conduct constitutes aggravated misconduct that is morally reprehensible.

125.     The unlawful conduct of Earle constitutes intentional or reckless conduct that justifies the imposition of punitive damages against Defendants, under OKLA. STAT. tit. 23, § 9.1, in an amount not less than $75,000.

## J.  FRAUD

126.      Plaintiffs re-allege and incorporate each and every allegation above as though fully set forth herein.

127.     Corporate Defendants engaged in a deliberate and intentional scheme of fraud from which they derived monetary benefits.

24

128.     As a result of Corporate Defendants' deliberate and intentional scheme of fraud, Plaintiffs suffered damages in excess of $75,000 and are entitled to recover attorney's fees, costs, and interest.

**K.  RESULTING OR CONSTRUCTIVE TRUST - EQUITABLE LIEN AGAINST EARLE**

129.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

130.     Upon information and belief, Defendant Earle used UPPR assets and funds for his personal use and expenses without authority to do so, and he has misappropriated UPPR funds.

131.     Plaintiffs are entitled to imposition of a resulting or constructive trust and equitable lien on any and all monies and other UPPR assets misappropriated or improperly received by Earle, as well as any proceeds thereof and all property obtained with such funds.

**L.  CONVERSION**

132.      Plaintiffs re-allege and incorporate each and every allegation above as though fully set forth herein.

133.     Defendant Earle sold or directed that assets, including the biomass, owned by UPPR be transferred to Linear Park.  This transfer provided a personal benefit to Earle because he is a shareholder of Linear Park and the transfer was accomplished with assistance, advice, and cooperation from other Corporate Defendants.

134.     The property disposed of or sold was owned by UPPR and UPPR did not receive fair value in return.

135.     Corporate Defendants' multiple conversions of the assets damaged the value of Plaintiffs' shares in an amount in excess of $75,000.

136.    The actions of Corporate Defendants were willful, malicious and in conscious disregard of the rights of others.  Therefore, Plaintiffs are also entitled to an award of punitive damages.

**M.  RESULTING IN CONSTRUCTIVE TRUST – EQUITABLE LIEN AGAINST UPPR AND OTHER COMPANY DEFENDANTS**

137.     Plaintiffs re-allege and incorporate each and every allegation above as though fully set forth herein.

138.    Upon information and belief, Corporate Defendants transferred UPPR assets into a holding company owned by themselves, personally benefitting for the transfer.

139.    Plaintiffs are entitled to an order, judgment and decree imposing a resulting or constructive trust and equitable lien on any and all monies and other UPPR assets misappropriated or improperly received by Corporate Defendants, the proceeds thereof as well as on any other property, real or personal, obtained with such funds or proceeds.

**CONCLUSION AND PRAYER**

WHEREFORE, Plaintiffs demand judgment in UPPR's favor against all Defendants as follows:

A.  Requiring UPPR to produce to Plaintiffs, for inspection and copying, all documents requested in the demand letter;

B.  Ordering an accounting of the finances of UPPR;

C.  Declaring that Plaintiffs may maintain this action on behalf of UPPR and that Plaintiffs are adequate representatives;

D.  Awarding actual damages in excess of $1,000,000.00 to Plaintiffs for Common Law Fraud, as well as damages for Securities Fraud under applicable state and federal laws committed by or aided and abetted by Earle, McDougall and Livingston;

E.  Declaring that Defendants Earle, McDougall, and Livingston have breached or aided and abetted the breaches of fiduciary duties to UPPR;

F.  Determining and awarding damages in excess of $1,000,000.00 to UPPR for the harm suffered as a result of the violations set forth above from each of Earle, McDougall, and Livingston, jointly and severally, and the Demand Defendants, jointly and severally, with interest thereon;

G.  Ordering the removal of Defendant Earle from the current Board of Directors and as an officer of UPPR;

H.  Ordering a clawback of all salary, bonuses, stock options or other compensation received by Defendants Earle, McDougall, and Livingston during the entire period of their involvements with UPPR;

I.  Declaring a resulting trust or in the alternative an equitable lien on all property, monies and other UPPR assets misappropriated or inappropriately received by Earle, McDougall, and Livingston;

J.  Ordering that UPPR take all necessary reforms to improve its corporate governance and internal procedures to comply with the applicable rules, regulations and laws and to protect UPPR from a repeat of the damaging events described herein, including, but not limited to, putting forth a shareholder vote on the following resolutions to amend the Company's By-Laws and Articles of Incorporation:

l.  A provision which would strengthen the Board's supervision and oversight of operations and implement procedures for greater shareholder input into the policies of the Board;

2.  A provision which would mandate that the Board's subcommittees must meet not less frequently than quarterly and that a detailed agenda and materials must be

circulated for review by each Board subcommittee member at least two weeks prior to the subcommittee meeting;

3. A proposal which would ensure the implementation of effective oversight to ensure compliance with applicable rules, regulations, and laws; and

4. A provision which would provide for the clawback of salary, bonuses, stock options or any compensation where material harm to the Company can be traced to the actions of any executive, officer or director of the Company.

K. Determining and awarding UPPR exemplary damages in an amount necessary to punish Earle, McDougall, and Livingston and to deter future behavior of a similar nature;

L. Damages for Conversion or in the alternative an order awarding UPPR restitution from Earle, McDougall, and Livingston of all assets of any kind taken by any or all of them from UPPR;

M. Awarding UPPR restitution from Linear Park, and PrimaPharma of anything of value received by any of them from UPPR, Earle, Livingston, or McDougall;

N. Awarding Plaintiff costs and disbursements of this action, including reasonable attorney's fees, expert fees, costs, and expenses; and

O. Granting such other and further equitable relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury.

DATED AND FILED ___May 7_____, 2020.

Respectfully submitted,

___/s/ R. Brent Blackstock_____

R. Brent Blackstock, OBA No. 00839
Lacey L. Shirley, OBA No. 33269
Brent Blackstock, PLC
401 S. Boston Ave., Suite 500
Tulsa, OK 74103
Phone: 918-383-0777
E-mail: brent@brentblackstock.com
**ATTORNEYS FOR PLAINTIFFS**

<u>VERIFICATION</u>

I, JAMES JANIS, hereby declare as follows:

I am a plaintiff within the entitled action. I have read the Verified Complaint and know the contents of it. Based upon the discussion with and reliance upon my counsel, and as to those facts which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and accepted.

Dated: 5-5-2020

_____
James Janis

## Acknowledgement by Individual

State of Colorado
County of Pueblo

This record was acknowledged before me on May 5, 20 20
by James Janis (name(s) of individual(s)).

_____
(Notary's official signature)

Notary Public
(Title of office)

01-05-2022
(Commission Expiration)

DEBRA A. GARNER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 19984000234
MY COMMISSION EXPIRES 01/05/2022

## VERIFICATION

I, KEITH THOMAS, hereby declare as follows:

I am a plaintiff within the entitled action. I have read the Verified Complaint and know the contents of it. Based upon the discussion with and reliance upon my counsel, and as to those facts which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and accepted.

Dated: _5/5/20_

_____
Keith Thomas



RECEIVED
JUL 1 2 2019
OFFICE OF THE SECRETARY

BEFORE THE UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C.

---

*Upper Street Marketing, Inc. et al. v. United States
Securities and Exchange Commission*

**UPPER STREET MARKETING INC. and
JOSEPH EARLE, Shareholder,**

*Petitioners*

vs.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

*Respondent*

---

Petition to the United States Securities and Exchange
Commission pursuant to Rule 550 of the Commission's Rules of Practice

Securities and Exchange Act of 1934,
Release No. 34-8622 (June 27, 2019)

---

**PETITION OF UPPER STREET MARKETING INC. AND JOSEPH EARLE
UNDER RULE 550 OF THE SECURITIES AND EXCHANGE COMMISSSION
RULES OF PRACTICE**

**FOLEY & LARDNER** LLP
Pamela L. Johnston
555 South Flower Street, Suite 3300
Los Angeles, California 90017
Telephone:   213.972.4500
Fax:            213.486.0065
Email:   *pjohnston@foley.com*

**KRUEGER LLP GROUP**
Blair Krueger
7486 La Jolla Blvd.
La Jolla, California 92037
Telephone:   858.405.7385
Fax:   858.454.2411
Email: blair@thekruegergroup.com

*Attorneys for Petitioner UPPER STREET MARKETING INC. and JOSEPH EARLE*

## INTRODUCTION

Petitioners Upper Street Marketing Inc. ("UPPR") and Joseph Earle ("Mr. Earle"), UPPR's President and a major shareholder, hereby file this timely[1] petition (this "**Petition**") with the United States Securities and Exchange Commission (the "**Commission**") pursuant to Rule 550 of the Rules of Practice of the Commission (the "**Commission Rules**"). Petitioners are requesting that the Commission (1) rescind and void its June 27, 2019, order (the "**Order**") that suspended trading in UPPR's stock for ten days (the "**Suspension**") and, to the extent necessary, (2) not require the process outlined in Rule 15c2-11 under the Exchange Act ("Rule 15c2-11"), codified at 17 C.F.R. Section 240.15c2-11, be followed to recommence trading in UPPR stock.[2] *See* Declaration of Mr. Earle, ¶11. Because UPPR and Mr. Earle have been adversely affected by the Suspension, which the Commission issued pursuant to 15 U.S.C. 78*l*(k)(1)(A), they are entitled to petition for the above relief and, as more fully explained below, seek to show that such relief is warranted because the Suspension was issued without appropriate constitutional safeguards and was not necessary in the public interest or for the protection of investors.

## STATEMENT OF FACTS

A.  The Commission Suspended Trading in UPPR.

Without any prior notice of its concerns or any opportunity to address these concerns, on June 27, the Commission suspended trading in the securities of UPPR

---

[1] The Commission served the Order by mail; Mr. Earle on received it on July 3, 2019.  This petition, therefore, is timely filed.  *See* Declaration of Mr. Earle, ¶11.

[2] The facts herein have been sworn to by Mr. Earle.  *See* Declaration of Mr. Earle.

2

because of questions concerning the accuracy and adequacy of information publicly disseminated about UPPR since November 2018:

1. Public statements by UPPR dated May 8, 2019 and May 23, 2019 concerning $10.55 million worth of purported financing for UPPR;

2. Public statements by UPPR dated April 30, 2019 and May 23, 2019 denying its retention of an investor relations firm despite apparent possible promotional activity on behalf of UPPR; and

3. Inadequate statements, since at least November 2018, concerning a possible private offering of at least $3 million dollars in UPPR's common stock.

B. <u>UPPR Voluntarily Amended the Filings Referenced in the Order.</u>

In the two weeks since the Commission issued the Order, UPPR voluntarily amended the relevant filings to address the Commission's issues.  If it had been provided with proper notice and an opportunity to cure these issues in advance of the Suspension, it would have been able to respond in a similarly expeditious manner.  Specifically, by July 12, 2019, UPPR had amended the filings to provide a detailed description of: (a) the investor relations firms engaged by UPPR; (b) the law firms engaged by UPPR; (c) UPPR's independent auditor; (d) the merger and acquisition transaction; and (e) the history of UPPR's completed financings.  *See* Declaration of Mr. Earle, ¶14.

## ARGUMENT

A. <u>The Regulatory Scheme, As Applied to Suspend Trading in UPPR, Violates Due Process.</u>

*1. General Rule of Notice and Opportunity to Be Heard*

4830-5822-9404.4

The Commission issued its Order on an *ex parte* basis without providing UPPR any notice of the action or opportunity to be heard prior to the Suspension; the Commission did not obtain this extraordinary relief from a neutral judicial officer. As such, the Commission did not comply with "the root requirement" of the due process clause to give notice *before* acting. <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 542 (1985) (emphasis in original).

    *2. The <u>Opp Cotton</u> Exception Is Not Applicable*

With respect to actions taken by administrative agencies like the Commission, federal courts have held that the demands of due process may not require a hearing at the initial stage, or at any particular point in the proceeding, so long as a hearing is held *before* the final order becomes effective. <u>Opp Cotton Mills v. Administrator</u>, 312 U.S. 126, 152, 153 (1941)(emphasis added). For OTC companies, however, a trading suspension is effectively a final order (and the likely demise of the company). Not only is there no further action that the Commission needs to take but also the consequences of the onerous 211 process that the SEC requires have lasting effects for OTC companies.

To the extent that the Commission may rely on a case that held that plaintiff's due process rights were not denied by a prompt post-deprivation review of the trading suspension, <u>Xumanii Int'l Holdings Corp. v. SEC</u>, that case does not control here. 670 Fed. Appx. 508 (9th Cir. Oct. 19, 2016). First, <u>Xumanii</u>, as an unpublished case, not considered precedent. Ninth Circuit Rule 36-3. Second, <u>Xumanii</u> does not establish whether or not the Court considered the onerous burden of the Rule 15c2-11 process that the SEC requires, delaying the re-trading of the stock for two to six months, in its

4830-5822-9404.4

decision that Xumanii's due process rights were adequately protected. *See* 670 Fed.
Appx. at 509. Third, that decision is so bare as to be unusable.

Furthermore, the application of this practice is patently unfair to OTC issuers. A
trading suspension for an OTC company equates to an unconstitutional de-listing. It
evidently has also become the SEC policy now, as well, to support FINRA against OTC
companies. This joint policy of FINRA and the SEC has developed slowly over many
years and now imposes an automatic re-filing of a 211 by a market-maker for any OTC
company which has any type of trading suspension, whether temporary or permanent.
Here, the Commission did not hold a hearing before implementing a "temporary"
suspension which, in fact, amounted to a *de facto* de-listing of UPPR's stock off of the
OTC exchange.

SEC Rule 211 does not facially discriminate against OTC stocks. Still, based
upon the steadfast application of FINRA and SEC "policy," the process of temporary
suspension is never good for an OTC stock. When the Constitution requires a hearing, it
requires a fair one, held before a tribunal that meets currently prevailing standards of
impartiality. Wong Yang Sung v. McGrath, 339 U.S. 33, 50 (1950). A party in UPPR's
position must be given an opportunity not only to present evidence, but also to know the
claims of the opposing party and to meet them. Those who are brought into contest with
the government in a quasi-judicial proceeding aimed at control of their activities are
entitled to be fairly advised of what the government proposes and to be heard upon the
proposal before the final order is issued. Margan v. United States, 304 U.S. 1, 18–19
(1938).

B. Pre-Action Notice and Hearing Protects UPPR's Investors.

UPPR, Mr. Earle, other shareholders and its lenders are being hurt by the cessation of trading in UPPR's stock.  In its Order, the Commission announced that it had issued a trading suspension of UPPR stock due to questions about the "accuracy and adequacy" of information publicly disseminated by or about UPPR in three key areas:

*1. Public Statements by UPPR Dated May 8, 2019 and May 23, 2019 Concerning Its $10.55 Million in Financing*

UPPR did not issue any press releases on either date; rather, under previous advisory relationships with its prior legal counsel and auditors, UPPR made filings on these dates with the OTC.  UPPR has now corrected and amended within the last two weeks as described more particularly above.  No public issue remains about these filings.  If the Commission had inquired about these filings, this amendment process would have occurred without the need to suspend trading.[3]

*2. Public Statements by UPPR Dated April 30, 2019 and May 23, 2019 Denying Retention of an Investor Relations Firm*

Again, since the issuance date of the Order, UPPR has corrected and amended these OTC filings.  See Declaration of Mr. Earle, ¶14.  UPPR has disclosed the investor relations firm with which it has been working.

*3. Inadequate Statements, Since November 2018, By UPPR about A Possible Private Offering of At Least $3 Million.*

UPPR never announced publicly that it had obtained $10.55 million in financing with Michael Sobec or anyone else.  It did negotiate with Mr. Sobec for such financing, but that deal never closed.  Instead, the $10.55 million, comprised of a $10 million equity line plus a $500,000 bridge loan, never closed because the equity line required UPPR to

---

[3] UPPR did not author, plan or distribute any offending press releases.  Only those press releases which are authorized by UPPR's board are the lawful press releases of UPPR. UPPR publishes its press releases exclusively on *OTCmarkets.com*, and nowhere else.  Any other releases are not authorize releases.

4830-5822-9404.4

uplist to OTCQB and file an S-1 Registration Statement. The "$3 million" raise predated

the desired "$10.5 million" raise by six months (approximately October 1, 2018) and was

simply the sale of restricted stock to accredited investors under Rule 144.

Again, UPPR has amended to filings to make the history of its financing clearer

and the history of its merger and acquisition transaction clearer.

C. The Commission's Actions Violate the APA.

The process here, once the ten day suspension expires, continues on without

disclosure or resolution for UPPR or its shareholders. SEC has an informal rule, which

violates the Administrative Procedures Act because this rule was not passed pursuant to

the APA that requires the filing of new 15c2-11 filing pursuant to 17 C.F.R Section

240.15c2-11 without that regulation actually requiring it after a suspension of an OTC

stock.[4]  Stewart v. Smith, 673 F. 2d 485, 498 (1982) ("a rule may not be characterized as

one of 'management' or 'personnel' if it has a substantial effect on persons outside the

agency."). This illegal process will harm UPPR's shareholders in three ways. (1)

UPPR's shareholders now cannot trade for many months and their investment has

become illiquid; (2) UPPR's shareholders concurrently have experienced substantial

dilution from predatory lenders who have added shares as the stock now remains dormant

or "gray"; and (3) once trading re-opens (after a presumed minimum 6-month delay in

15c2-11 approval), the "old" stock price shall plummet. This whole process hurts

investors, and it should not be imposed here.

This is not by law or regulation; rather, 17 CFR § 240.15c2-11 amounts to a mere

*policy* requiring that broker-dealers file a "new 211" every time information about the

---

[4] Here is one place informal rule is found. https://www.sec.gov/investor/alerts/tradingsuspensions.pdf

4830-5822-9404.4

issuer goes stale.  But a suspension does not mean that the information about the OTC

filer is stale.  SEC policy, especially here, should be waived.

     D. <u>The Commission Committed an Illegal Taking.</u>

     Without a hearing prior to the suspension, the suspension of an OTC stock

amounts to an unlawful taking.  Suspending trading essentially strips Mr. Earl's stock of

its value, as it makes it illiquid.  Suspending trading effects a taking of Mr. Earl's

property by removing its value without compensation until a 211 is filed.  *See* <u>Knick v.</u>

<u>Twp. Of Scott</u>, 588 U.S. ___ slip op. at 8 (2019) ("a property owner has a Fifth

Amendment entitlement to compensation as soon as the government takes his property

without paying for it. ").

4830-5822-9404.4

## CONCLUSION

The Commission is targeting OTC companies unfairly while relying upon an illegal, informal rule that demands automatic re-filing of a 211 by a market-maker if the issuer's trading is suspended, even temporarily. This is not rooted in law or regulation. To remedy this constitutionally deficient process, UPPR urges the Commission to vacate and rescind the Suspension, provide UPPR with a legitimate, transparent constitutional process to be heard, and have UPPR's arguments considered by a neutral judicial officer. If needed, the Petitioners also request that the Commission permit expedited briefing (including a short reply) and an expedited hearing on this petition and as result of that briefing and hearing, the Commission rescind and void the Suspension and order that no one is required to follow the process outlined in 17 C.F.R Section 240.15c2-11 for the shares of UPPR to commence trading again.

Respectfully submitted,

**FOLEY & LARDNER** LLP

Pamela L. Johnston

**KRÜEGER LLP**
Blair Kruger

*Attorneys for Petitioners UPPER
STREET MARKETING INC. and
JOSEPH EARLE*

DATE: July 12, 2019

9

4830-5822-9404.4

## CERTIFICATE OF COMPLIANCE

I certify that the attached PETITION uses a 12-point, Times New Roman font and contains 2082 words.

Dated:  July 12, 2019

Respectfully submitted,

**FOLEY & LARDNER** LLP

Pamela Johnston, Esq.
*Attorneys for Petitioner UPPER STREET MARKETING INC.*

10

## AFFIDAVIT OF JOSEPH EARLE

I, Joseph Earle, state:

1. I am the President of Upper Street Marketing Inc.  I have had a long and successful business career of over 43 years: first, for two decades as a licensed stock broker; then second, over 30 years as executive management for a variety of both private and public operating companies.

2. From 1979 through 1998, I held a number of securities licenses with FINRA (then "NASDR").  Those various licenses included a Series 1 license, a Series 7, 24, 63 and others.  I voluntarily let these licenses expire in 1998 through non-renewal.  During these two decades, I had no disclosures or regulatory issues anywhere as reflected in my U-4.

3. During the past 24 years of my business career, I have served as a CFO, a CEO and COO of multiple technology and operating companies.  These technologies include, but are not limited to, telecommunications, pharmaceuticals, medical devices, hardware and software engineering, electronic manufacturing as well as mechanical engineering and manufacturing.  I have successfully executed numerous mergers, acquisitions and other exit strategies for these businesses.

4. In approximately April 2018, I was retained to manage and operate a water technology company, Growing Springs LLC ("Growing Springs") which provided their technology to hemp growers.

5. In August 2018, I expanded this opportunity to a dormant public company, Upper Street Marketing Inc. (OTC trading symbol: "UPPR"), in order to pursue opportunities in the Hemp and CBD markets domestically and internationally.  In September 2018, I executed a reverse take-over of UPPR (the "RTO").  Since the RTO, and before, UPPR has never

1

engaged to any degree in any business pursuit within the so-called "Cannabis industry",

specifically, or in a segment or sub-segment of any type of commercial Cannabis

enterprise, generally. The Petitioner, UPPR, is not a cannabis company.

6.  Since September 2018, UPPR has raised approximately $3 million dollars necessary to

    execute its business plan of hemp cultivation and CBD extraction via the sale of restricted

    144 stock to accredited investors.

7.  Since September 2018, UPPR has successfully acquired the use of over 1,200 acres

    needed to grow industrial hemp in and around Center, Colorado. UPPR has planted and

    is cultivating these 1,200 acres in order to produce 2,000,000 pounds of biomass needed

    to extract CBDs.

8.  UPPR has purchased a 100,000 square foot CBD processing facility at 701 3rd St, Center,

    Colorado.

9.  UPPR has leased a 12,000 square foot laboratory at 3444 Tripp Court, San Diego,

    California, needed to process and manufacture CBDs.

10. UPPR is poised to be one of the largest producers of CBDs in the world.

11. The Securities and Exchange Commission personally served me with the Cease Trade

    Order on behalf of the Petitioner on July 3, 2019. *See* Trading Suspension Order date

    June 27, 2019 (the ("Order"), Commission Release No. 34- 86228,

    *www.sec.gov/litigation/suspensions/2019/34-86228.pdf.*

12. All UPPR press releases are on the OTC Markets website. Anything not on the OTC site

    is bogus or from unrelated and unknown third parties, bloggers or others not affiliated

    with UPPR. UPPR has never at any time released false and misleading information.

2

13. UPPR began selling restricted 144 stock to accredited investors in September

2018. These stock sales pre-dated the reference to a $10.55 million facility in the Cease

Trade Order.  Under the terms of the Harbor Gate Financing, on or about April 26, 2019,

UPPR and Harbor Gate LLC entered into a financing agreement with two important

components: (a) a $550,000 bridge loan fundable to UPPR immediately; and (b) a

$10,000,000 equity line fundable for UPPR upon (i) UPPR's uplisting to the OTCQB and

(ii) UPPR's filing of an S-1 Registration Statement with the Commission, whichever

event occurs later.

14. Since the date of the Order, UPPR has filed amendments to its filings with the OTC since

September 2018.  These amendments include and address each of the issues identified by

the Commission in its Order, to wit:

    a. Identifying names of, and details about, investor relations firms hired by UPPR in

       order to correct omissions or misstatements in UPPR's public OTC filings on April

       30, 2019 and May 23, 2019;

    b. Identifying names of, and details about: (a) the law firms engaged by UPPR; (b)

       UPPR's independent auditor; and (c) the merger and acquisition transaction, in

       order to correct omissions or misstatements in UPPR's public OTC filings.

    c. Rectifying inadequate statements in public filings dated May 8 and May 23, 2019

       of UPPR by providing, by amendment to its public OTC filings, a detailed

       description of the Harbor Gate transaction (with exhibits);

    d. Rectifying inadequate or unintentionally omitted statements in public filings since

       November 2018 concerning the Harbor Gate Financing and other matters;

3

    e.  Amending UPPR's public filings for December 31, 2018 and its quarterly report
dated March 31, 2019.

The amendments to each of UPPR's filings are now presently available on the web at the
following link to the OTC website: *www.otcmarkets.com/stock/UPPR/disclosure.*

15. The recent SEC cease trade Order executed against Upper Street Marketing Inc. has
greatly damaged me, my wife, and our family. Personally, I own 35 million shares of
UPPR stock and 10 million Common Stock purchase warrants for a total of 45 million
common shares, making me the largest shareholder of UPPR. Prior to the cease trade
order the most recent price was $1.50 cents per share.  The effective value of my personal
holdings was over $67 million dollars. I am not able to trade my shares now; if this
situation does not change, I will have lost $67 million,  At age 65, the cease trade Order,
if not rescinded, may likely cause a substantial loss to me personally, which in turn shall
dramatically affect my plans for our retirement.  Prior to this cease trade Order, my wife
and I were making a number of detailed retirement plans for the next few years that will
likely be significantly impaired by the Order. Additionally, my wife and I were making
plans for our children and grandchildren that are also impacted by the cease trade
order.  It is my wish that the Commission will reconsider its position and immediately
rescind this unfair Order, let UPPR repair this damage, and get UPPR back to its true
mission and corporate purpose.

16. The Cease Trade Order is doing irreparable damage to UPPR.

17. Paragraphs 18 through 25 have been intentionally omitted.

4

26. I have read and reviewed in detail the Petition filed by UPPR with the Commission. I

hereby verify the facts alleged in the Petition by the attorneys for UPPR.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.  Executed this 11th day of July 2019 in San Diego, California.

_Joseph Earle_

Joseph Earle

See attached
Cert# 215375?
Exp. 6/16/20

4

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**　　　　　　　CIVIL CODE § 1189

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California　　　　　　　　　　)
County of _San DIEGO_____　)

On __7/11/19____ before me, _EMILY Ann SELF, NOTARY PUBLIC,_
　　　*Date*　　　　　　　　　　　　　*Here Insert Name and Title of the Officer*

personally appeared _____JOSEPH  EARLE_____
　　　　　　　　　　　　　　　　　*Name(s) of Signer(s)*

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

EMILY ANN SELF
Notary Public - California
San Diego County
Commission # 2153751
My Comm. Expires Jun 16, 2020

Signature _____
　　　　　　　*Signature of Notary Public*

　　　　*Place Notary Seal Above*
─────────────────── **OPTIONAL** ───────────────────
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _Affidavit of Joseph EARLE_ Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____　　　Signer's Name: _____
☐ Corporate Officer — Title(s): _____　　☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General　　　　☐ Partner — ☐ Limited  ☐ General
☐ Individual　　☐ Attorney in Fact　　　　☐ Individual　　☐ Attorney in Fact
☐ Trustee　　　☐ Guardian or Conservator　☐ Trustee　　　☐ Guardian or Conservator
☐ Other: _____　　　　☐ Other: _____
Signer Is Representing: _____　　　Signer Is Representing: _____

---

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)  Item #5907

Case 4:20-cv-00193-TCK-JFJ   Document 2 Filed in USDC ND/OK on 05/07/20   Page 48 of 88

# Upper Street Marketing Inc. Announces Strategic Partnership in Canada



April 18, 2019 20:09 ET | **Source:** Upper Street Marketing Inc.

San Diego, CA, April 18, 2019 (GLOBE NEWSWIRE) -- via NEWMEDIAWIRE -- Upper Street Marketing Inc. (OTC Market, trading symbol UPPR) and its wholly-owned subsidiary, Growing Springs Holding Corporation, has announced a strategic partnership with Catch Capital Partners Inc. (CATCH) to jointly develop cannabis and hemp production and extraction in Canada. Under the terms of the partnership arrangement, UPPR will acquire a twenty percent (20%) interest in the common voting equity of CATCH in exchange five million common voting shares of UPPR.

"UPPR is excited to join forces with the experienced management team at CATCH to develop their immediate and future [outdoor] cultivation and extraction projects which have the potential to provide significant cannabis and hemp supply," said Joseph Earl, the Chief Executive Officer of UPPR. Mr. Jeff Wareham, the Chief Executive Officer of CATCH, added that "Our strategic partnership with UPPR provides strong complementary synergies and is expected to accelerate the development of our near-term and longer-term initiatives. We are particularly excited that UPPR has a formal working relationship with PrimaPharm, a San Diego based cGMP certified pharmaceutical producer, which will enable CATCH to ensure their products and processes meet what we believe will be the gold standard for the burgeoning medical cannabinoid market."

Upper Street Marketing Inc. is a publicly traded Oklahoma Corporation that specializes in acquisition, finance and management of hemp cultivation, extraction and CBD manufacturing in Colorado and other US States. UPPR is uniquely serving its target markets with cGMP grade cultivation and manufacturing standards. The rapidly expanding hemp, CBD and cannabis markets in the North American and world markets is a perfect opportunity for UPPR and Growing Springs Holdings Corporation.

UPPR and Growing Springs Holdings Corporation are ideally positioned to capitalize on recent regulatory changes that dramatically enhance opportunities in hemp production and CBD extraction as well as FDA concerns regarding use of CBDs in the marketplace.

Growing Springs Holdings Corporation website is **www.growingspringsholdings.com**.

CATCH is an Ontario, Canada based company focused on outdoor cannabis and hemp production. Catch has identified a unique property with the potential to be a market leading outdoor project. The project offers exceptional access to infrastructure, existing facilities uniquely suited to cannabis production, access to freshwater; gas, municipal water, and over 200 acres of highly productive agricultural land. Catch is actively seeking to develop further properties suitable for hemp and cannabis production.

Upper Street is also pleased to announce that it is completing its fully audited financial statements, and expects to file for both full SEC compliance and to uplist to the OTCQB markets over the next weeks.

Cautionary Language Concerning Forward-Looking Statements

Statements in this press release may be "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "anticipate", "believe", "estimate", "expect", "intend", and similar expressions, as they relate to the Company or its management, identify forward-looking statements. These statements are based on current expectations, estimates, and projections about the Company's business, based, in part, on assumptions made by management. These statements are not guarantees of future performance and involve risks, uncertainties, and assumptions that are difficult to predict. Therefore, actual outcomes and results may, and probably will, differ materially from what is expressed or forecasted in such forward-looking statements due to numerous factors. Such statements could be affected by risks and uncertainties related to: (i) our ability to execute the Company's business plans with the uncertainty of agricultural crops (ii) product demand, market, and customer acceptance of the Company's products, (iii) the Company's ability to obtain financing to expand our operations, (iv) the Company's ability to attract qualified sales representatives, (v) competition, pricing and development difficulties, (vi) the Company's ability to conduct the business if there are changes in laws, regulations, or government policies related to the Company's products, (vii) the Company's ability to conduct operations if it faces product recalls, and (viii) general industry and market conditions and growth rates and general economic conditions. Any forward-looking statements speak only as of the date on which they are made, and the Company does not undertake any obligation to update any forward-looking statement to reflect events or circumstances after the date of this release.

```
For Further Information Contact:
Upper Street Marketing
Inc.:                                               .
Phone: (844) 535-UPPR
(8777)
Email investorrelations@upperstreetmarketing.com

Catch Capital Partners Inc

Phone (519) 494-6884
```

Newswire Distribution Network & Management

- Home
- Newsroom
- RSS Feeds
- Legal

## About Us

**GlobeNewswire** is one of the world's largest newswire distribution networks, specializing in the delivery of corporate press releases financial disclosures and multimedia content to the media, investment community, individual investors and the general public.

© 2020 GlobeNewswire, Inc. All Rights Reserved.

4/29/2020    Upper Street Marketing Secures 1.5 Million Pounds of Hemp for CBD Extraction | Globe Newswire
Case 4:20-cv-00193-TCK-JFJ   Document 2 Filed in USDC ND/OK on 05/07/20   Page 51 of 88
EXHIBIT C
PAGE 1 OF 3

# Upper Street Marketing Secures 1.5 Million Pounds of Hemp for CBD Extraction



f  🐦  in  G+  📌       @ Email        🖨 Print Friendly        ❮ Share

May 28, 2019 00:15 ET | **Source:** Upper Street Marketing Inc.

SAN DIEGO, CA, May 28, 2019 (GLOBE NEWSWIRE) -- via NEWMEDIAWIRE – Upper Street Marketing Inc. (OTC Markets: symbol **UPPR**) and its wholly owned subsidiary Growing Springs Holding Corp. have entered into an agreement to process 1.5 million pounds of hemp biomass into cannabidiol (CBD) isolates and distillates with a value of approximately $200 million.

Fox Organic Farms will deliver the biomass from its 830-acre Saguache, Colorado cultivation to UPPR-affiliated extraction facilities in October, where it will be converted into pharmaceutical-grade CBD products in exchange for a 50% share of the revenue.

"Ryan Fox is one of the sharpest guys transforming the Colorado agricultural landscape and we are extremely happy to get this opportunity to work with him," noted Upper Street CEO Joseph Earle. "Hemp is a delicate crop that requires expert handling to optimize CBD extraction yields without going over federal THC limits. We're eager to see what he brings in."

Since Fox is a noted figure within the Colorado recreational cannabis and CBD industry, recognizing revenue will be assured that the extracts are produced and delivered — especially given the fact that current CBD supply falls far short of projected demand.

Fortune magazine and other publications have contemplated a 100X surge in CBD consumption between now and 2023, at which point UPPR and other producers will need to ramp up output from a currently minimal 50,000 kg of isolate to as much as 3.5 million kg. An estimated 7% of Americans are currently consuming CBD products, with that population conservatively expanding 30% (to 25 million adults) by 2025.

Fox already has an extensive network of commercial relationships in place through sales of CBD extracts will occur. Even though we anticipate a 10-18% CBD yield, even at a low nominal 5% CBD yield (10-18% is more common), this arrangement can easily generate substantial cash flow for UPPR while its own Colorado hemp crop approaches harvest and extraction.

Recent industry pricing on CBD isolates are running above $3,000 per pound ($7,000 per kilogram) and many organic hemp farmers target yields of 15% CBD or higher.

Case 4:20-cv-00193-TCK-JFJ   Document 2   Filed in USDC ND/OK on 05/07/20

"While we are eager to bring in our own hemp crop, processing Fox Organic Farms biomass provides us with incremental revenue and a robust proof of concept," Joseph Earle explains.

"Successful execution will put UPPR on the national map and makes it like that we exceed our initial $75 million revenue target for the year, opening the door to more extensive cooperation with Fox Organic Farms in the future."

**About Upper Street Marketing and CBD**

Now fully legal as a non-psychoactive product of industrial hemp, CBD has been promoted as an effective treatment for everything from arthritis to insomnia. To date, the only FDA-approved uses are for two rare forms of childhood epilepsy. With one of the only integrated "seed to consumer" platforms for participating in all phases of the industry from crop to value-added commercial and clinical product development, UPPR intends to be a leader in FDA cGMP (Current Good Manufacturing Practice) capabilities in the hemp and CBD marketplace.

**Cautionary Language Concerning Forward-Looking Statements**

Statements in this press release may be "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "anticipate", "believe", "estimate", "expect", "intend", and similar expressions, as they relate to the Company or its management, identify forward-looking statements. These statements are based on current expectations, estimates, and projections about the Company's business, based, in part, on assumptions made by management. These statements are not guarantees of future performance and involve risks, uncertainties, and assumptions that are difficult to predict. Therefore, actual outcomes and results may, and probably will, differ materially from what is expressed or forecasted in such forward-looking statements due to numerous factors. Such statements could be affected by risks and uncertainties related to: (i) our ability to execute the Company's business plans with the uncertainty of agricultural crops (ii) product demand, market, and customer acceptance of the Company's products, (iii) the Company's ability to obtain financing to expand our operations, (iv) the Company's ability to attract qualified sales representatives, (v) competition, pricing and development difficulties, (vi) the Company's ability to conduct the business if there are changes in laws, regulations, or government policies related to the Company's products, (vii) the Company's ability to conduct operations if it faces product recalls, and (viii) general industry and market conditions and growth rates and general economic conditions. Any forward-looking statements speak only as of the date on which they are made, and the Company does not undertake any obligation to update any forward-looking statement to reflect events or circumstances after the date of this release.

```
For Further Information Contact:
Upper Street Marketing
Inc.                                                    .
Phone: (844) 535-UPPR
(8777)
Email: investorrelations@upperstreetmarketing.com
```

Case 4:20-cv-00193-TCK-JFJ Document 2 Filed in USDC ND/OK on 05/07/20 Page 53 of 88

## Newswire Distribution Network & Management

- Home
- Newsroom
- RSS Feeds
- Legal

## About Us

**GlobeNewswire** is one of the world's largest newswire distribution networks, specializing in the delivery of corporate press releases financial disclosures and multimedia content to the media, investment community, individual investors and the general public.

© 2020 GlobeNewswire, Inc. All Rights Reserved.

# Upper Street Marketing Approaches Full-Scale Pharmaceutical-Grade CBD Extraction With Multi-Million Dollar Equipment Order



June 24, 2019 06:15 ET | **Source:** Upper Street Marketing Inc.

SAN DIEGO, CA, June 24, 2019 (GLOBE NEWSWIRE) -- via NEWMEDIAWIRE – Upper Street Marketing Inc. (OTC Markets: symbol **UPPR**) has finalized a binding multi-million dollar agreement to purchase state-of-the-art extraction systems from ICC Group (**https://www.icc-inc.net**) designed to process up to 2 million pounds of raw hemp biomass a year into 120,000 liters of crude cannabidiol (CBD) free from psychoactive contaminants.

"ICC Group is one of the preeminent pharmaceutical manufacturing equipment companies in the world," said UPPR CEO Joseph Earle. "Executing this agreement puts us on track to start converting raw hemp into CBD distillates and concentrates within the next 120 days."

ICC Group personnel have designed and installed manufacturing plants, automated production systems and other projects budgeted at over $1 billion over the past quarter century. Clients in the pharmaceutical space include some of the largest and most prestigious companies in the world and many more large multinational companies that demand adherence to FDA current Good Manufacturing Practice (cGMP) standards.

Achieving that level of quality control without sacrificing productivity on a highly compressed timeline is central to the ICC Group mission and essential to UPPR's business plan. Processing the raw hemp plant into legal CBD products requires sensitive and transparent systems to ensure that psychoactive components remain within federal limitations for sale in all jurisdictions.

The systems UPPR has purchased will support a fully cGMP environment at all stages of the CBD production cycle from initial biomass delivery to output in easily transported 5-gallon containers. These containers of full-spectrum hemp oil will then be shipped from Colorado to UPPR's San Diego laboratory for processing into higher-grade distillates and isolates.

As the FDA holds its first hearings on CBD marketing and development practices, manufacturers that can meet cGMP standards now will be in a stronger position to comply if, for example, regulators decide to segregate high-grade CBD products from those currently on the market.

"With an anticipated 2 million tons of hemp biomass already moving toward harvest and UPPR processing facilities, securing true pharmaceutical-grade systems ensures that we provide superior products and dramatically enhances our leadership on compliance and quality," CEO Joseph Earle said.

"We have the raw hemp supply relationships, the production facilities and contract manufacturing partnerships in place. Now that the equipment itself is coming, the road to an extraction start and significant revenue event as early as September is now clear."

Fortune magazine and other publications have contemplated a 100X surge in CBD consumption between now and 2023, at which point UPPR and other producers will need to ramp up output from a currently minimal annual 50,000 kg of isolate to as much as 3.5 million kg annually.

Recent industry pricing on CBD isolates are running above $3,000 per pound ($7,000 per kilogram) and many organic hemp farmers target yields of 15% CBD or higher.

UPPR has also retained FDA-certified contract pharmaceutical manufacturer PrimaPharma (**http://www.primapharma.net**) to ensure that all products meet regulatory and commercial standards.

"We remain on track to reach our stated goal of installing enough capacity to produce over 100,000 kg of CBD isolate a year within the next 36 months," CEO Earle explained.

**About Upper Street Marketing and CBD**

An estimated 7% of Americans are currently consuming CBD products, with that population conservatively expanding 30% (to 25 million adults) by 2025. Now fully legal as a non-psychoactive product of industrial hemp, CBD has been promoted as an effective treatment for everything from arthritis to insomnia. To date, the only FDA-approved uses are for two rare forms of childhood epilepsy. With one of the only integrated "seed to consumer" platforms for participating in all phases of the industry from crop to value-added commercial and clinical product development, UPPR intends to be a leader in FDA cGMP (Current Good Manufacturing Practice) capabilities in the hemp and CBD marketplace.

**Cautionary Language Concerning Forward-Looking Statements**

Statements in this press release may be "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "anticipate", "believe", "estimate", "expect", "intend", and similar expressions, as they relate to the Company or its management, identify forward-looking statements. These statements are based on current expectations, estimates, and projections about the Company's business, based, in part, on assumptions made by management. These statements are not guarantees of future performance and involve risks, uncertainties, and assumptions that are difficult to predict. Therefore, actual outcomes and results

4/29/2020    Upper Street Marketing Approaches Full-Scale Pharmaceutical-Grade CBD Extraction With Multi-Million Dollar Agreement to Grow Othe...

EXHIBIT D
PAGE 3 OF 3

may, and probably will, differ materially from what is expressed or forecasted in such forward-looking statements due to numerous factors. Such statements could be affected by risks and uncertainties related to: (i) our ability to execute the Company's business plans with the uncertainty of agricultural crops (ii) product demand, market, and customer acceptance of the Company's products, (iii) the Company's ability to obtain financing to expand our operations, (iv) the Company's ability to attract qualified sales representatives, (v) competition, pricing and development difficulties, (vi) the Company's ability to conduct the business if there are changes in laws, regulations, or government policies related to the Company's products, (vii) the Company's ability to conduct operations if it faces product recalls, and (viii) general industry and market conditions and growth rates and general economic conditions. Any forward-looking statements speak only as of the date on which they are made, and the Company does not undertake any obligation to update any forward-looking statement to reflect events or circumstances after the date of this release.

```
For Further Information Contact:
Upper Street Marketing Inc.:

Phone: (844) 535-UPPR (8777)

Email: investorrelations@upperstreetmarketing.com
```

---

## Newswire Distribution Network & Management

- Home
- Newsroom
- RSS Feeds
- Legal

## About Us

**GlobeNewswire** is one of the world's largest newswire distribution networks, specializing in the delivery of corporate press releases financial disclosures and multimedia content to the media, investment community, individual investors and the general public.

© 2020 GlobeNewswire, Inc. All Rights Reserved.

Case 4:20-cv-00193-TCK-JFJ   Document 2 Filed in USDC ND/OK on 05/07/20   Page 57 of 88

**Markets**

Market Activity

Corporate Services

OTC Link ATS

Market Data

Learn

About

Blog

About    Blog    OTCIQ        IQ

| Quote | | | | |
|---|---|---|---|---|
| 📈 Stock Screener | OTC MARKETS TOTALS | SECURITIES 10,870 | DOLLAR VOL $1.9B | SHARE VOL 4.6B | TRADES 285,812 |

Market Activity / Stock / UPPR / News / ·

# UPPR
Upper Street Marketing, Inc.

Common Stock



Overview   Quote   Company   Security   News   Financials   Disclosure   Research
                   Profile    Details

Expert Market

Caveat Emptor

Transfer Agent Verified

## OTC DISCLOSURE & NEWS SERVICE

**Upper Street Marketing Takes its Next Hemp Crop "Inside," Filling its Facility with $3 Million in Additional Grow Equipment, Projects $15 Million in Additional Revenues**

Press Release | 06/26/2019

SAN DIEGO, CA, June 26, 2019 (GLOBE NEWSWIRE) -- via NEWMEDIAWIRE – With this year's 1,200-acre hemp crop in the ground and moving toward harvest, Upper Street Marketing Inc. (OTC Markets: symbol **UPPR**) and its partners are now expanding their revenue focus beyond the 2019 cannabidiol (CBD) extraction cycle in a $3 million stock for equipment transaction of indoor grow equipment. UPPR will issue $3 million worth of UPPR common shares to the seller, Fox Organic Farms.

The purchase of 100,000 watts of state-of-the-art greenhouse lighting capacity enables UPPR to dedicate a section of its 100,000 square-foot hemp extraction facility to seed and transplant production during the fallow season once an anticipated 2 million of biomass from the outdoor crop has been processed.

Cultivating hemp seed in full compliance with federal regulations is notoriously difficult outdoors, where one wrongly sexed plant can ruin a multi-million-dollar harvest. As a result, seed and transplant operations depend on the carefully controlled conditions that only an indoor facility can support.

"Adding a winter cultivation to our calendar further expands our hemp business model and extends our 2020 revenue projections by at least $15 million," said UPPR CEO Joseph Earle. "If you were wondering what we

would be doing after our projected first $200 million harvest at the end of the third quarter, this is it."

CBD producers like UPPR are already facing extremely favorable supply dynamics for the 2019 crop year as soaring commercial demand forces the industry to find ways to expand output from a currently minimal 50,000 kg of CBD isolate to as much as 3.5 million kg before 2023.

With enough light to start the 2020 crop early as well as provide seedlings for other growers, UPPR is now in position to translate what would have otherwise been seasonal slack into a profitable new business line, furthering its mission of becoming one of the world's only true vertically integrated seed-to-store CBD companies.

Ryan Fox, a noted figure within the national recreational cannabis industry, is providing the equipment through his Fox Organic Farms of Saguache, Colorado in exchange for stock.

Because UPPR has adopted the highest FDA Good Manufacturing Practices (GMP) to support both consumer CBD merchandising partners and pharmaceutical-grade manufacturing, CEO Earle is optimistic that the facility will provide potential partners with the highest-quality seedlings.

"All potential hemp growers should demand valid documentation that the seed or clones they are purchasing meet THC standards and are suitable for industrial production," he explained. "We can do that."

An estimated 7% of Americans are currently consuming CBD products, with that population conservatively expanding 30% (to 25 million adults) by 2025. Given fragmentation and inefficiency in the newly legalized industry, strategic leadership is essential.

### About Upper Street Marketing and CBD

Now fully legal as a non-psychoactive product of industrial hemp, CBD has been promoted as an effective treatment for everything from arthritis to insomnia. To date, the only FDA-approved uses are for two rare forms of childhood epilepsy. With one of the only integrated "seed to consumer" platforms for participating in all phases of the industry from crop to value-added commercial and clinical product development, UPPR intends to be a leader in FDA cGMP (Current Good Manufacturing Practice) capabilities in the hemp and CBD marketplace.

### Cautionary Language Concerning Forward-Looking Statements

Statements in this press release may be "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "anticipate", "believe", "estimate", "expect", "intend", and similar expressions, as they relate to the Company or its management, identify forward-looking statements.

These statements are based on current expectations, estimates, and projections about the Company's business, based, in part, on assumptions made by management. These statements are not guarantees of future performance and involve risks, uncertainties, and assumptions that are difficult to predict. Therefore, actual outcomes and results may, and probably will, differ materially from what is expressed or forecasted in such forward-looking statements due to numerous factors. Such statements could be affected by risks and uncertainties related to: (i) our ability to execute the Company's business plans with the uncertainty of agricultural crops (ii) product demand, market, and customer acceptance of the Company's products, (iii) the Company's ability to obtain financing to expand our operations, (iv) the Company's ability to attract qualified sales representatives, (v) competition, pricing and development difficulties, (vi) the Company's ability to conduct the business if there are changes in laws, regulations, or government policies related to the Company's products, (vii) the Company's ability to conduct operations if it faces product recalls, and (viii) general industry and market conditions and growth rates and general economic conditions. Any forward-looking statements speak only as of the date on which they are made, and the Company does not undertake any obligation to update any forward-looking statement to reflect events or circumstances after the date of this release.

For Further Information Contact:
Upper Street Marketing Inc.:                          .
Phone: (844) 535-UPPR (8777)
Email: investorrelations@upperstreetmarketing.com

‹ Back to News Headlines

## Other Financial Information

Recent News & Disclosure Filings ›

Recent SEC Filings ›

| QUOTE | | SYMBOL | LAST | CHANGE | BID | ASK | VOLUME | TIME |
|---|---|---|---|---|---|---|---|---|
| | | OTCM | 29.82 | 2.34 (8.52%) | 29.66 | 30.00 | 1523 | 13:49 |

      

Contact

Careers

Market Hours

Glossary

© 2020 OTC Markets Group Inc.    Terms of Service    Linking Terms    Trademarks    Privacy Statement    Risk Warning    Supported Browsers

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 34- 86228 / June 27, 2019**

The Securities and Exchange Commission ("Commission") announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading in the securities of Upper Street Marketing, Inc. ("UPPR"), of San Diego, California at 9:30 a.m. EDT on June 28, 2019, and terminating at 11:59 p.m. on July 12, 2019.

The Commission temporarily suspended trading in the securities of UPPR because of questions about the accuracy and adequacy of information publicly disseminated concerning UPPR, including, among other things: (1) public statements by UPPR dated May 8, 2019 and May 23, 2019 concerning $10.55 million worth of purported financing for UPPR; (2) public statements by UPPR dated April 30, 2019 and May 23, 2019 denying its retention of an investor relations firm despite apparent possible promotional activity on behalf of UPPR; and (3) inadequate statements, since at least November 2018, concerning a possible private offering of at least $3 million dollars in UPPR's common stock. This order was entered pursuant to Section 12(k) of the Exchange Act.

The Commission cautions broker-dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the company.

Further, brokers and dealers should be alert to the fact that, pursuant to Rule 15c2-11 under the Exchange Act, at the termination of the trading suspension, no quotation may be entered unless and until they have strictly complied with all of the provisions of the rule. If any broker or dealer has any questions as to whether or not he has complied with the rule, he should not enter any quotation but immediately contact the staff in the Division of Trading and Markets, Office of Interpretation and Guidance, at (202) 551-5777. If any broker or dealer is uncertain as to what is required by Rule 15c2-11, he should refrain from entering quotations relating to UPPR's securities until such time as he has familiarized himself with the rule and is certain that all of its provisions have been met. If any broker or dealer enters any quotation which is in violation of the rule, the Commission will consider the need for prompt enforcement action.

If any broker, dealer or other person has any information that may relate to this matter, they should immediately contact Marc J. Blau, Assistant Regional Director, at (323) 965-3975, or Roberto A. Tercero, Senior Counsel, at (323) 965-3891. The Commission appreciates the assistance of the Financial Industry Regulatory Authority (FINRA) and OTC Markets Group, Inc.

**Markets**

Market Activity

Corporate Services

OTC Link ATS

Market Data

Learn

About

Blog

About   Blog   OTCIQ     IQ

| | | | | | |
|---|---|---|---|---|---|
| **Quote** 🔍 | OTC MARKETS TOTALS | SECURITIES 10,870 | DOLLAR VOL $1.9B | SHARE VOL 4.6B | TRADES 285,812 |

📈 Stock Screener

Market Activity / Stock / UPPR / News / ·

# UPPR
## Upper Street Marketing, Inc.
Common Stock

Overview   Quote   Company Profile   Security Details   News   Financials   Disclosure   Research

☠ Caveat Emptor

☠ Expert Market

🛡 Transfer Agent Verified

### OTC DISCLOSURE & NEWS SERVICE

**Upper Street Marketing Acts in Response to SEC and OTC Trading Suspension**

Press Release | 07/08/2019

SAN DIEGO, CA, July 08, 2019 (GLOBE NEWSWIRE) -- via NEWMEDIAWIRE -- As previously disclosed on June 27, 2019, the Securities and Exchange Commission ("Commission") announced in Release Number 34-86228 the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading in the securities (the "Trading Suspension") of Upper Street Marketing Inc. (OTC Markets: symbol **UPPR**) of San Diego, California at 9:30 a.m. EDT on June 28, 2019, and terminating at 11:59 p.m. on July 12, 2019.  UPPR is currently communicating and in discussions with the Commission asking the Commission to remove the Trading Suspension and to permit a resumption of trading on the OTC Pink market.

OTC Markets Group Inc. ("OTC Markets") announced last week online at *OTCmarkets.com* that it has discontinued the display of quotes on UPPR common shares because UPPR has been labeled "Caveat Emptor" (buyer beware). OTC Markets Group designates certain securities as "Caveat Emptor" and places a skull and crossbones icon next to the stock symbol to inform investors that there may be reason to exercise additional caution and perform thorough due diligence before making an investment decision in that security.

**The Caveat Emptor Designation may be assigned when OTC Markets becomes aware of one or more of the following:**

- **Promotion**— The security is the subject of stock promotion that may be misleading or manipulative. Promotional activities may include news releases, spam email, and newsletters, whether they are published by the issuer or a third party. *See* OTC Markets Group's Policy on Stock Promotion at *OTCmarkets.com*.
- **Investigation of Fraud or Other Criminal Activities**— There is an investigation or other indication of fraudulent or other criminal activity involving the company, its securities or insiders.
- **Suspension/Halt**— A regulatory authority or an exchange has halted or suspended trading for public interest concerns (i.e. not a news or earnings halt).
- **Undisclosed Corporate Actions**— The security or company is the subject of a corporate action, such as a reverse merger, stock split, or name change, without adequate current information being publicly available.
- **Other Public Interest Concern**— OTC Markets Group may determine that there is a public interest concern regarding the security. Such concerns may include but are not limited to promotion campaigns (including third-party), unusual or unexplained trading activity, spam or disruptive corporate actions even when adequate current information is available.

OTC Markets will resume the display of UPPR's stock quotes once adequate current information is made available by UPPR pursuant to the Alternative Reporting Standard or by the SEC Reporting Standard, and until OTC Markets believes there is no longer a public interest concern. Investors are encouraged to use caution and due diligence in their investment decisions. Please read the OTC Market's *Investor Protection* page and *OTC Markets Policy Regarding Caveat Emptor* at *OTCmarkets.com* for more information.

The Commission temporarily suspended trading in the securities of UPPR last because of questions about the accuracy and adequacy of information publicly disseminated concerning UPPR, including, among other things: (1) public statements by UPPR dated May 8, 2019 and May 23, 2019 concerning $10.55 million worth of purported financing for UPPR; (2) public statements by UPPR dated April 30, 2019 and May 23, 2019 denying its retention of an investor relations firm despite apparent possible promotional activity on behalf of UPPR; and (3) inadequate statements, since at least November 2018, concerning a possible private offering of at least $3 million dollars in UPPR's common stock. This order was entered pursuant to Section 12(k) of the Exchange Act.

The Commission has cautioned broker-dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by UPPR.

Further, brokers and dealers should be alert to the fact that, pursuant to Rule 15c2-11 under the Exchange Act, at the termination of the trading suspension, no quotation may be entered for UPPR unless and until such B-Ds have strictly complied with all of the provisions of the rule. If any broker or dealer has any questions as to whether or not he or she has complied with the rule, he or she should not enter any quotation but immediately contact the staff in the Division of Trading and Markets, Office of Interpretation and Guidance, at (202) 551-5777. If any broker or dealer is uncertain as to what is required by Rule 15c2-11, he or she should refrain from entering quotations relating to UPPR's securities until such time as he has familiarized himself with the rule and is certain that all of its provisions have been met. If any broker or dealer enters any quotation for UPPR which is in violation of the rule, the Commission will consider the need for prompt enforcement action.

For Further Information Contact:

Upper Street Marketing Inc.:
Phone: (844) 535-UPPR (8777)
Email: investorrelations@upperstreetmarketing.com

About Upper Street Marketing and CBD

Now fully legal as a non-psychoactive product of industrial hemp, CBD has been promoted as an effective treatment for everything from arthritis to insomnia. To date, the only FDA-approved uses are for two rare forms of childhood epilepsy. With one of the only integrated "seed to consumer" platforms for participating in all phases of the industry from crop to value-added commercial and clinical product development, UPPR intends to be a leader in FDA cGMP (Current Good Manufacturing Practice) capabilities in the hemp and CBD marketplace.

Cautionary Language Concerning Forward-Looking Statements

Statements in this press release may be "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "anticipate", "believe", "estimate", "expect", "intend", and similar expressions, as they relate to the Company or its management, identify forward-looking statements. These statements are based on current expectations, estimates, and projections about the Company's business, based, in part, on assumptions made by management. These statements are not guarantees of future performance and involve risks, uncertainties, and assumptions that are difficult to predict. Therefore, actual outcomes and results may, and probably will, differ materially from what is expressed or forecasted in such forward-looking statements due to numerous factors. Such statements could be affected by risks and uncertainties related to: (i) our ability to execute the Company's business plans with the uncertainty of agricultural crops (ii) product demand, market, and



customer acceptance of the Company's products, (iii) the Company's ability to obtain financing to expand our operations, (iv) the Company's ability to attract qualified sales representatives, (v) competition, pricing and development difficulties, (vi) the Company's ability to conduct the business if there are changes in laws, regulations, or government policies related to the Company's products, (vii) the Company's ability to conduct operations if it faces product recalls, and (viii) general industry and market conditions and growth rates and general economic conditions. Any forward-looking statements speak only as of the date on which they are made, and the Company does not undertake any obligation to update any forward-looking statement to reflect events or circumstances after the date of this release.

‹ Back to News Headlines

Other Financial Information

Recent News & Disclosure Filings                    ›

Recent SEC Filings                                   ›



QUOTE                              SYMBOL    LAST     CHANGE      BID      ASK     VOLUME   TIME
                                   OTCM      29.82    2.34        29.66    30.00   1523     13:49
                                                      (8.52%)

Contact
Careers
Market Hours
Glossary

© 2020 OTC Markets Group Inc.    Terms of Service    Linking Terms    Trademarks    Privacy Statement    Risk Warning    Supported Browsers



Case 4:20-cv-00193-TCK-JFJ   Document 2 Filed in USDC ND/OK on 05/07/20   Page 66 of 88

**– Markets**

Market Activity

Corporate Services

OTC Link ATS

Market Data

Learn

About

Blog

About   Blog   OTCIQ        IQ

| Quote | 🔍 |
|---|---|

📈 Stock Screener

| | OTC MARKETS TOTALS | SECURITIES | DOLLAR VOL | SHARE VOL | TRADES |
|---|---|---|---|---|---|
| | | 10,870 | $1.9B | 4.6B | 285,812 |

Market Activity / Stock / UPPR / News / –

# UPPR
Upper Street Marketing, Inc.

Common Stock



Overview   Quote   Company Profile   Security Details   News   Financials   Disclosure   Research

☠️ Caveat Emptor

Expert Market

🛡️ Transfer Agent Verified

OTC DISCLOSURE & NEWS SERVICE

**Upper Street Marketing Announces Acquisition of FDA Licensed Pharmaceutical Manufacturer as Regulators Enforce Hemp and CBD Manufacturing Standards**

Press Release | 07/08/2019

SAN DIEGO, CA, July 08, 2019 (GLOBE NEWSWIRE) -- via NEWMEDIAWIRE – Upper Street Marketing Inc. (OTC Markets: symbol UPPR) and PrimaPharma Inc. ("PPI") (www.Primapharma.net) of San Diego, California, an FDA-licensed pharmaceutical manufacturer, have signed a Letter of Intent ("LOI") providing for UPPR to acquire an 80% interest in PPI.

The letter of intent memorializes the commercial relationship the companies have "cultivated" since January 22, 2019 in which PrimaPharma Inc., agreed to provide UPPR with services and support for the development of hemp derived CBD products for sale and distribution utilizing FDA current Good Manufacturing Practices (cGMP).

"Over the last four months our relationship with PrimaPharma Inc., proved to be such a natural fit that the principals on both sides realized we can do even more together," Upper Street CEO Joseph Earle explained. "With this agreement, UPPR has many additional tools and resources to expand our footprint in the rapidly expanding CBD industry and beyond.  FDA cGMP standards will require vertically integrated seed-to-consumer regulatory requirements that are currently missing in much of the current CBD industry."

Earle further explains, "I have worked with members of the PrimaPharma team for a decade. We are absolutely a

great fit. "The PrimaPharma team are experts at GMP. The further regulatory reach described by the FDA in recent Washington DC hearings, make cGMP compliance mandatory for domestic CBD providers. Consumers need confidence in the supply of CBD's."

Under the terms of the LOI signed today, UPPR will provide the necessary capital to expand PrimaPharma's manufacturing and laboratory capabilities. The expanded capabilities will greatly extend the ability of PPI to deliver sterile products and for UPPR to deliver mass CBD production to its target markets and seal the vertical integration loop.

PrimaPharma will add approximately $5 million in assets and is cash-flow-neutral at a $6+ million run rate. Following an audit, the acquisition as currently structured will be accretive in the first year after closing, which UPPR management anticipates in four to six weeks.

Strategically, the union of UPPR with PrimaPharma also guarantees that production capacity will expand at a moment when retail demand for CBD isolates and distillates far outstrips supply.

Fortune magazine and other publications have contemplated a 100X surge in CBD consumption between now and 2023, at which point UPPR and other producers will need to ramp up output from a currently minimal 50,000 Kg of isolate to as much as 3.5 million Kg.

An estimated 7% of Americans are currently consuming CBD products, with that population conservatively expanding 30% (to 50 million adults) by 2025. Given the fragmentation and inefficiency in the newly legalized industry, strategic leadership is essential.

UPPR's newly leased 13,000 square foot laboratory and manufacturing facility is adjacent to PrimaPharma's existing San Diego operations, allowing for a nearly seamless development of processes and quality systems necessary for the production of hemp derived cGMP products.

About Upper Street Marketing and CBD

Now fully legal as a non-psychoactive product of industrial hemp, CBD has been promoted as an effective treatment for everything from arthritis to insomnia. To date, the only FDA-approved uses are for two rare forms of childhood epilepsy. With one of the only integrated "seed to consumer" platforms for participating in all phases of the industry from crop to value-added commercial and clinical product development, UPPR intends to be a leader in FDA cGMP (current Good Manufacturing Practice) capabilities in the hemp and CBD marketplace.

Cautionary Language Concerning Forward-Looking Statements

Statements in this press release may be "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "anticipate", "believe", "estimate", "expect", "intend", and similar expressions, as they relate to the Company or its management, identify forward-looking statements. These statements are based on current expectations, estimates, and projections about the Company's business, based, in part, on assumptions made by management. These statements are not guarantees of future performance and involve risks, uncertainties, and assumptions that are difficult to predict. Therefore, actual outcomes and results may, and probably will, differ materially from what is expressed or forecasted in such forward-looking statements due to numerous factors. Such statements could be affected by risks and uncertainties related to: (i) our ability to execute the Company's business plans with the uncertainty of agricultural crops (ii) product demand, market, and customer acceptance of the Company's products, (iii) the Company's ability to obtain financing to expand our operations, (iv) the Company's ability to attract qualified sales representatives, (v) competition, pricing and development difficulties, (vi) the Company's ability to conduct the business if there are changes in laws, regulations, or government policies related to the Company's products, (vii) the Company's ability to conduct operations if it faces product recalls, and (viii) general industry and market conditions and growth rates and general economic conditions. Any forward-looking statements speak only as of the date on which they are made, and the Company does not undertake any obligation to update any forward-looking statement to reflect events or circumstances after the date of this release.

For Further Information Contact:
Upper Street Marketing Inc.:                                    .
Phone: (844) 535-UPPR (8777)
Email: investorrelations@upperstreetmarketing.com

 f   y

‹ Back to News Headlines

---

## Other Financial Information

| Recent News & Disclosure Filings | › |
|---|---|
| Recent SEC Filings | › |

OTC Markets | OTCM

| | SYMBOL | LAST | CHANGE | BID | ASK | VOLUME | TIME |
|---|---|---|---|---|---|---|---|
| QUOTE | OTCM | 29.82 | 2.34 (8.52%) | 29.66 | 30.00 | 1523 | 13:49 |

Contact
Careers
Market Hours
Glossary

© 2020 OTC Markets Group Inc.   Terms of Service   Linking Terms   Trademarks   Privacy Statement   Risk Warning   Supported Browsers

# Upper Street Marketing Inc Announces the Completion of the Harvest of its Hemp Biomass Crop

 f  🐦  in  G+  📌  @ Email    🖨 Print Friendly    ☁ Share

November 26, 2019 12:46 ET | **Source:** Upper Street Marketing Inc.

San Diego, CA, Nov. 26, 2019 (GLOBE NEWSWIRE) -- via NEWMEDIAWIRE -- Upper Street Marketing Inc. (OTC Market, trading symbol UPPR) and its wholly-owned subsidiary, Growing Springs Holding Corporation, has announced the completion of the harvest of its hemp biomass crop.

In line with our vision to ensure a sustainable supply of raw materials for consumer-facing CBD products, hemp and CBD firm Upper Street Marketing (OTC: UPPR) recently announced the completion of the cultivation and harvesting of its various 2019 hemp crops.

The approximately 2 million pounds of hemp biomass crops have been cut from the UPPR fields in Colorado and are stored in the 100,000 square foot building in Center, Colorado.

CBD content COA's have tested in various ranges with several testing over 10% CBD content.  All 2019 crops have tested in 100% compliance with Colorado law regarding THC levels.

Joe Earle, the CEO of Upper Street and Growing Springs, said, "We are very pleased with our first hemp crop and the results of the testing for CBD content and low THC content. This is a crop that is very well suited to being extracted and turned into very valuable CBD crude oils, CBD isolates and CDB distillates. With what we have learned this year, we are very confident that we can expand our acreage for 2020."

For Further Information Contact:
Upper Street Marketing Inc.
Phone: (844) 535-UPPR (8777)

Email investorrelations@upperstreetmarketing.com

About Upper Street Marketing and CBD

An estimated 7% of Americans are currently consuming CBD products, with that population conservatively expanding 30% (to 45 million adults) by 2025. Now fully legal as a non-psychoactive product of industrial hemp, CBD has been promoted as an

effective treatment for everything from arthritis to insomnia. To date, the only FDA-approved uses are for two rare forms of childhood epilepsy. With one of the only integrated "seed to consumer" platforms for participating in all phases of the industry from crop to value-added commercial and clinical product development, UPPR intends to be a leader in FDA cGMP (Current Good Manufacturing Practice) capabilities in the hemp and CBD marketplace.

Cautionary Language Concerning Forward-Looking Statements
Statements in this press release may be "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "anticipate", "believe", "estimate", "expect", "intend", and similar expressions, as they relate to the Company or its management, identify forward-looking statements. These statements are based on current expectations, estimates, and projections about the Company's business, based, in part, on assumptions made by management. These statements are not guarantees of future performance and involve risks, uncertainties, and assumptions that are difficult to predict. Therefore, actual outcomes and results may, and probably will, differ materially from what is expressed or forecasted in such forward-looking statements due to numerous factors. Such statements could be affected by risks and uncertainties related to: (i) our ability to execute the Company's business plans with the uncertainty of agricultural crops (ii) product demand, market, and customer acceptance of the Company's products, (iii) the Company's ability to obtain financing to expand our operations, (iv) the Company's ability to attract qualified sales representatives, (v) competition, pricing and development difficulties, (vi) the Company's ability to conduct the business if there are changes in laws, regulations, or government policies related to the Company's products, (vii) the Company's ability to conduct operations if it faces product recalls, and (viii) general industry and market conditions and growth rates and general economic conditions. Any forward-looking statements speak only as of the date on which they are made, and the Company does not undertake any obligation to update any forward-looking statement to reflect events or circumstances after the date of this release.

Newswire Distribution Network & Management

- Home
- Newsroom
- RSS Feeds
- Legal

About Us

**GlobeNewswire** is one of the world's largest newswire distribution networks, specializing in the delivery of corporate press releases financial disclosures and multimedia content to the media, investment community, individual investors and the general public.

© 2020 GlobeNewswire, Inc. All Rights Reserved.


# Upper Street Marketing Completes the Acquisition of CBD Extraction Equipment

f   🐦   in   G+   📌    @ Email    🖨 Print Friendly    ⌣ Share

December 09, 2019 09:15 ET | **Source:** Upper Street Marketing Inc.

SAN DIEGO, CA, Dec. 09, 2019 (GLOBE NEWSWIRE) -- via NEWMEDIAWIRE – Upper Street Marketing Inc. (OTC Market, trading symbol UPPR) and its wholly-owned subsidiary, Growing Springs Holding Corporation, has announced the completion of its acquiring 5 hemp biomass extraction modules, capable of extracting CBD isolates and distillates from hemp.

In line with their vision to ensure a sustainable supply of raw materials for consumer-facing products, Hemp and CBD firm Upper Street Marketing (OTC: UPPR) recently announced the completion of a key agreement to acquire 5 biomass extraction modules from Portland-based supplier ICC Northwest.

This will build and enhance UPPR's ability to extract hemp biomass for its 2020 expansion. Each of the 5 modules are expected to supply an additional 20,000 pounds of daily extraction capacity for UPPR's biomass processing program, raising the overall extraction numbers to 100,000 pounds of hemp biomass each day.

The modules, whose financing has been successfully completed, are set to be delivered to UPPR in April 2020. The event is a significant milestone for the company's plans to process and extract the 2,000,000 pounds of hemp biomass that it has stockpiled from its 2019 cultivation exercises via strategic Colorado hemp farms, and to process hemp biomass from other hemp growers.

UPPR's President Joseph Earle said, "This is a key win in his company's bid to position itself as a transformative force in the bullish CBD market. This is an exciting moment for both us and for the still-nascent CBD industry because of the strategic importance of additional operational volume. The equipment and capacity building will bring us one step closer to realizing Upper Street Marketing's ambitious vision to usher in an FDA cGMP compliant revolution the CBD consumables market."

The company reports that additional modules will be in action within 3-4 weeks of delivery. UPPR expects to push up production momentum to 100,000 pounds of hemp-biomass per-day by late May 2020. The capacity will be used to ramp up processing, production, and distribution of both CBD distillate as well as the company's strategic foray into CBD-related products.

4/29/2020     Upper Street Marketing Completes the Acquisition of CBD Extraction Equipment/Order October ...

EXHIBIT J
PAGE 2 OF 2

Case 4:20-cv-00193-TCK-JFJ Document 2 Filed in USDC ND/OK on 05/07/20 Page 73 of 88

**About Upper Street Marketing and CBD**

Now fully legal as a non-psychoactive product of industrial hemp, CBD has been promoted as an effective treatment for everything from arthritis to insomnia. To date, the only FDA-approved uses are for two rare forms of childhood epilepsy. With one of the only integrated "seed to consumer" platforms for participating in all phases of the industry from crop to value-added commercial and clinical product development, UPPR intends to be a leader in FDA cGMP (Current Good Manufacturing Practice) capabilities in the hemp and CBD marketplace.

For Further Information Contact: Upper Street Marketing Inc.: Phone: (844) 535-UPPR (8777) Email: investorrelations@upperstreetmarketing.com

---

## Newswire Distribution Network & Management

- Home
- Newsroom
- RSS Feeds
- Legal

## About Us

**GlobeNewswire** is one of the world's largest newswire distribution networks, specializing in the delivery of corporate press releases financial disclosures and multimedia content to the media, investment community, individual investors and the general public.

© 2020 GlobeNewswire, Inc. All Rights Reserved.

# BakerHostetler

**Baker&Hostetler** LLP

600 Anton Boulevard
Suite 900
Costa Mesa, CA 92626-7221

T 714.754.6600
F 714.754.6611
www.bakerlaw.com

April 2, 2020

E-mail: pjohnston@foley.com

Randolf W. Katz
direct dial: 714.966.8807
direct fax:  714.966.8802
rwkatz@bakerlaw.com

Foley & Lardner, LLP
555 S. Flower Street, Suite 3300
Los Angeles, California 90071
Attn:  Pamela L. Johnston

Re:    Upper Street Marketing Inc.

Dear Ms. Johnston:

This firm has been engaged initially to analyze the rights of the equity holders of Upper Street Marketing, Inc., an Oklahoma corporation ("UPPR"), and UPPR's obligations to them.  In that context, we are aware of, and have had direct or indirect contact with, a material number of shareholders of UPPR, who collectively invested far in excess of four million dollars in primary purchases of UPPR's common stock (collectively, the "activist shareholders")[1].  This letter is written to you on the assumption that your firm is still representing UPPR and, derivatively, its officers and directors.  If the assumption is correct, and without suggesting how your firm manages client relations, I would be appreciative if you could share the contents of this letter with UPPR's officers and directors.  If the assumption is incorrect, I would be appreciative if you would advise me of such and would forward this letter to current counsel for UPPR.  If UPPR does not have current counsel, please forward this letter to each of Messrs. Joseph Earle, Gordon McDougall, and Mark Livingston, as my current understanding is that each of them is an officer or director (collectively, "management") of UPPR.  Further, you and the three individuals should also be aware that Ambassador Ned L. Siegel, of counsel to a law firm with offices in New York, New Jersey, and Florida, is assisting this firm in its engagement.  Finally, in accordance with Section 18-1065 of the Oklahoma General Corporation Act (the "OK GCA"), the activist shareholder has sent a copy of the enclosed demand to UPPR's registered office in the State of Oklahoma and to its principal place of business in San Diego, as well as to the three individuals mentioned above.

---

[1] For clarity, the activist shareholders do not currently constitute a group under Rule 13(d)-3 and, in any event, would not have any obligation to file a Schedule 13D or Schedule 13G, due to the filing by UPPR of a Form 15 (Certification and Notice of Termination of Registration Under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports Under Section 13 and 15(d) of the Securities Exchange Act of 1934).

Atlanta    Chicago    Cincinnati    Cleveland    Columbus    Costa Mesa    Denver
Houston    Los Angeles    New York    Orlando    Philadelphia    Seattle    Washington, DC

4814-8337-1449.1

Foley & Lardner, LLP
April 2, 2020
Page 2

The activist shareholders have become increasingly concerned with the lack of transparency provided by management in respect of the business and operations of UPPR.  They note that (i) UPPR has not held a shareholders' meeting in the past many years, if ever; (ii) UPPR has not updated its filings with OTC Markets Group Inc. ("OTCM"), under OTCM's alternative reporting standards, since July 12, 2019, when UPPR filed what it characterized as its "[Quarterly] Report Amendment #1 for the Period Ending: March 31, 2019"; and (iii) UPPR may have initiated, entered, or closed various material transactions (*e.g.*, the acquisition of hemp biomass extraction modules and the financing therefor and the transfer of all or substantially all of its assets to Linear Park Marketing, Inc., d/b/a "Linear Holdings", a Nevada corporation that the activist shareholders understand is controlled by Mr. Livingston).  The concerns set forth above is not intended to be, nor should it be interpreted to be, an exhaustive list of the concerns of the activist shareholders.

Included with this letter is a demand (the "demand") under oath (in accordance with Section 18-1065 of the OK GCA of one of the activist shareholders.  The demand of the specific activist shareholder is that UPPR and management permit exercise of statutory inspection and copying rights in respect of (i) UPPR's stock ledger, the list of its shareholders, and its other books and records and (ii) the books and records of UPPR's wholly-owned subsidiary, Growing Springs Holding Corporation ("GSHC"), and any other of its wholly-owned or majority-owned or consolidated subsidiaries.  Because the business of UPPR and GSHC is conducted in San Diego, the activist shareholder would request that the exercise of her inspection, copying, and extraction rights be conducted there.   In any event, the activist shareholder would expect that UPPR and management will comply with her demand not later than April 10, 2020, and provide reasonable notice to the activist shareholder and to me of the relevant date and time, and site.

I would be surprised if you, as well as UPPR and management, are unaware of the "five business day" provision of the OK GCA, which provides, in pertinent part, that the Oklahoma "court may summarily order the corporation to permit the shareholder to inspect the corporation's stock ledger, an existing list of shareholders, and its other books and records, and to make copies or extracts therefrom; . . ."  (*See* OK GCA Section 18-1065 C.[2])  I would expect that the party executing the

---

[2]  C  1.  If the corporation or an officer or agent thereof refuses to permit an inspection sought by a shareholder or attorney or other agent acting for the shareholder pursuant to the provisions of subsection B of this section or does not reply to the demand within five (5) business days after the demand has been made, the shareholder may apply to the district court for an order to compel an inspection.  The court may summarily order the corporation to permit the shareholder to inspect the corporation's stock ledger, an existing list of shareholders, and its other books and records, and to make copies or extracts therefrom; or the court may order the corporation to furnish to the shareholder a list of its shareholders as of a specific date on condition that the shareholder first pay to the corporation the reasonable cost of obtaining and furnishing the list and on other conditions as the court deems appropriate.

2.  Where the shareholder seeks to inspect the corporation's books and records, other than its stock ledger or list of shareholders, the shareholder shall first establish that:
   a.  the shareholder is a shareholder,
   b.  the shareholder has complied with the provisions of this section respecting the form and manner of making demand for inspection of the documents, and
   c.  the inspection the shareholder seeks is for a proper purpose.

3.  Where the shareholder seeks to inspect the corporation's stock ledger or list of shareholders and has complied with the provisions of this section respecting the form and manner of making demand for

Foley & Lardner, LLP
April 2, 2020
Page 3

attached demand will "apply to the district court for an order to compel an inspection" in the event
that "[UPPR] or an officer . . . thereof refuses to permit an inspection sought by [the demanding]
shareholder . . . pursuant to the provisions of subsection B of [Section 18-1065] or does not reply to
the demand within five (5) business days after the demand has been made."  I also expect that the
"demanding shareholder" (and, perhaps, other activist shareholders, as well) may well commence a
series of additional procedures in connection with (i) the original sales and issuances of the shares of
UPPR capital stock by UPPR and management and (ii) UPPR's and management's subsequent
actions and inactions.  I have been advised that more than adequate funding is available both for the
demanding shareholder's Oklahoma district court action, if and as required (both for this firm and
for local counsel), and for the above-referenced series of additional procedures that also may be
undertaken.

Notwithstanding the informal tone of this letter and the narrowly focused demand of the activist
shareholder, please understand that there are a myriad of serious matters involving UPPR, its
subsidiaries, and their respective officers and directors that will need to be addressed in the near
term, including potential federal and state securities law violations, fraudulent transfers and other
possibly fraudulent activities.  Accordingly, and it goes without saying, all rights of the activist
shareholders are reserved.

Thank you for your anticipated courtesy and cooperation in this matter.

Very truly yours,

Randolf W. Katz
Partner
For Baker & Hostetler LLP

RWK/dlp

cc:  Ambassador Ned L. Siegel (Ret.)

Encl. as noted

---

inspection of the documents, the burden of proof shall be upon the corporation to establish that the
inspection the shareholder seeks is for an improper purpose.  The court may, in its discretion, prescribe
any limitations or conditions upon the inspection, or award other or further relief as the court may
deem just and proper.  The court may order books, documents, and records, pertinent extracts
therefrom, or duly authenticated copies thereof, to be brought within this state and kept in this state
upon such terms and conditions as the order may prescribe.

The statutory provisions highlighted in yellow represent the "demanding shareholder's" expected ruling
from the Oklahoma district court in the event that UPPR and management do not properly respond to the
attached demand.  The statutory provisions highlighted in green represent the very best statutory case that
could be expected by UPPR and management.  I do not expect that UPPR and management will want to
"test the highlights."

4814-8337-1449.1

POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that NOORANI BURSTEIN, whose signature appears below, constitutes and appoints Aziz Patel, as her true and lawful attorney-in-fact and agent with full power of substitution, for her and in her name, place, and stead, in any and all capacities, to sign any and all documents in connection with her demand of even date herewith to permit her exercise of her statutory inspection and copying rights as set forth hereinbelow (collectively, the "Rights"), granting unto said attorney-in-fact and agent, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises directly or indirectly in connection with the exercise of the Rights, as fully to all intents and purposes as she might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent or any of them, or his or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof. The Rights are set forth in more detail in the document, a true and correct copy of the form of which is attached hereto as Exhibit A, in respect of (i) the stock ledger of Upper Street Marketing Inc., an Oklahoma corporation ("UPPR"), the list of its shareholders, and its other books and records and (ii) the books and records of UPPR's wholly-owned subsidiary, Growing Springs Holding Corporation, and any other of its wholly-owned or majority-owned or consolidated subsidiaries.

I, Noorani Burstein being the Principal named in this Power of Attorney hereby acknowledge:

    a.  I have read and understand the nature and effect of this Power of Attorney;

    b.  I am of legal age I the State of California to grant a Power of Attorney; and

    c.  I am voluntarily giving this Power of Attorney.

IN WITNESS WHEREOF, I hereunto set my hand and seal at the City of Beverly Hills in the State of California, this 2nd day of April, 2020.

_____
NOORANI BURSTEIN

The undersigned hereby accepts such appointment, this 2nd day of April, 2020.

_____
AZIZ PATEL

Demand Pursuant to Section 18-1065 of the Oklahoma General Corporation Act

To:      Upper Street Marketing, Inc., an Oklahoma corporation ("UPPR")

From:  Noorani Burstein [by Aziz Patel under power of attorney]

Dated: April 2, 2020

1.  My name is NOORANI BURSTEIN;

2.  I am the record holder of 13,500,000 shares of common stock of UPPR;

3.  Pursuant to Section 18-1065 of the Oklahoma General Corporation Act, I hereby demand that UPPR make available to me so that I might inspect, copy, and/or extract therefrom:

    A.  UPPR's stock ledger, a list of its shareholders, and its other books and records; and

    B.  A subsidiary's books and records.

4.  My demand, as set forth herein, is for one or more purposes, each reasonably related to my interest as a shareholder of UPPR, to wit: valuing my shares for income tax purposes, especially in connection with the skull and crossbones symbol noted on the quotations page of the OTC Markets Group Inc. in respect of UPPR; valuing my shares in connection with trading activity in the public markets, especially over-the-counter stocks and especially in connection with the disruptions to the public markets caused by COVID-19; obtaining information to put into context the contents of various UPPR press releases; obtaining information to put into context publicly available information not released by UPPR nor disclaimed by UPPR; obtaining information that a company, whose securities are quoted in the public markets, is to make available to the public market, generally, and to its equity holders, specifically.

Executed under penalty of perjury this 2nd day of April, 2020, at *Palm Desert*
*California*

*Noorani Burstein*
NOORANI BURSTEIN, by Aziz Patel under power of attorney

Demand Noorani Burstein for UPPR



| From: | TrackingUpdates@fedex.com |
|---|---|
| To: | Katz, Randolf W. |
| Subject: | FedEx Shipment 391589429160 Tendered to FedEx |
| Date: | Friday, April 3, 2020 7:12:07 PM |

[External Email: Use caution when clicking on links or opening attachments.]

FedEx®

# This shipment was tendered to FedEx Express on 04/03/2020.

## See "Preparing for Delivery" for helpful tips

## Tracking # 391589429160

| Ship date: | | Scheduled delivery: |
|---|---|---|
| **Fri, 4/3/2020** | | **Mon, 4/6/2020 by 10:30 am** |
| Randolf Katz | | Pamela L. Johnston |
| Baker Hostetler LLP | Picked up | Foley & Landner LLP |
| Costa Mesa, CA 92626 | | 555 S FLOWER ST STE 3300 |
| US | | LOS ANGELES, CA 90071 |
| | | US |

## Personalized Message

PSShip eMail Notification

## Shipment Facts

| | |
|---|---|
| Tracking number: | 391589429160 |
| Reference: | 009900.000010-07814 |
| Service type: | FedEx Priority Overnight® |
| Packaging type: | FedEx® Envelope |
| Number of pieces: | 1 |
| Weight: | 0.50 lb. |
| Special handling/Services: | Deliver Weekday |
| | No Signature Required |
| Standard transit: | 4/6/2020 by 10:30 am |

## Preparing for Delivery

To help ensure successful delivery of your shipment, please review the below.

### Won't be in?

You may be able to hold your delivery at a convenient FedEx World Service Center or FedEx Office location for pick up. Track your shipment to determine Hold at FedEx location availability.

## This tracking update has been requested by:

| | |
|---|---|
| Company name: | Baker Hostetler LLP |
| Name: | Randolf Katz |
| Email: | rkatz@bakerlaw.com |
| Sent to: | elopez@bakerlaw.com |

Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 7:12 PM CDT on 04/03/2020.

All weights are estimated.

The shipment is scheduled for delivery on or before the scheduled delivery displayed above. FedEx does not determine money-back guarantee or delay claim requests based on the scheduled delivery. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx customer support representative.

To track the latest status of your shipment, click on the tracking number above.

This tracking update has been sent to you by FedEx on behalf of the Requestor rkatz@bakerlaw.com. FedEx does not validate the authenticity of the requestor and does not validate, guarantee or warrant the authenticity of the request, the requestor's message, or the accuracy of this tracking update.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2020 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

EXHIBIT L
PAGE1 OF 5

# Dynamo Capital Corp. Announces Its Qualifying Transaction With A Leading CBD/Hemp Company

Vancouver, British Columbia--(April 8, 2020) - Dynamo Capital Corp. (TSXV:DDD.P) ("**Dynamo**" or the "**Company**") is pleased to announce that on April 3, 2020 it entered into a letter of intent (the "**LOI**") with Linear Park Marketing, Inc. ("**Linear**"). According to the terms of the LOI, the Company and Linear will negotiate, prepare and execute a definitive agreement (the "**Definitive Agreement**"), pursuant to which the Company will acquire all of the issued and outstanding shares of Linear (the "**Transaction**"). The Transaction is not a non-arm's length transaction, as such term is defined in Policy 2.4 – *Capital Pool Companies* of the Corporate Finance Manual of the TSX Venture Exchange (the "**Exchange**") and it is therefore anticipated that approval of the shareholders of the Company in respect of the Transaction will not be required. The Transaction will constitute the Company's qualifying transaction pursuant to the policies of the Exchange and is subject to regulatory approvals and other terms and conditions of the LOI.

**About Linear**

Linear has executed a definitive agreement to acquire (the "**UPPR Acquisition**") the assets and stated liabilities of Upper Street Marketing Inc. ("**UPPR**") (OTC:UPPR). UPPR is a vertically integrated company involved in industrial hemp genetics, cultivation, extraction and manufacturing of retail CBD related products. As of the date of this release, UPPR has raised approximately US$6 million in investment and, over the last twelve months, has grown and harvested 1,200 acres of hemp in the form of biomass to be sold and/or extracted and hemp seeds to be sold in the market. Concurrent with the Transaction, Linear intends to acquire (the "**PrimaPharma Acquisition**") an 80 percent interest in PrimaPharma, Inc. ("**PrimaPharma**"), an FDA registered pharmaceutical manufacturing facility in San Diego, California. PrimaPharma will remain a separate company and continue developing FDA acceptable pharmaceutical standards (cGMP) for the growing, harvesting and extracting of CBD for the world market.

For further information respecting Linear, please contact:

Dan Koziol
Chief Marketing Officer
Telephone: 619-822-9321

**The Transaction**

Dynamo will issue to the shareholders of Linear on a pro rata basis 100,000,000 common shares of the Company (the "**Consideration Shares**"), at a deemed issue price of $0.40 per Consideration Share, representing aggregate deemed consideration of $40,000,000. On completion of the Transaction, the former shareholders of Linear will own a majority of the issued and outstanding shares of the Dynamo (then, the "**Resulting Issuer**").

Completion of the Transaction is subject to the following conditions, among others: (i) completion of the UPPR Acquisition and the PrimaPharma Acquisition; (ii) negotiation and execution of the Definitive Agreement prior to April 30, 2020; (iii) receipt of all requisite regulatory, stock exchange, court or governmental approvals, authorizations and consents; (iv) completion of due diligence to the satisfaction of both parties; (v) completion of the Private Placement (as defined below); and (vi) if applicable, each party having received all necessary approvals from their shareholders.

EXHIBIT L
PAGE1 OF 5

**Private Placement**

In connection with the Transaction, it is anticipated that Dynamo will complete a non-brokered private placement (the "**Private Placement**") of common shares of Dynamo, at the price of $0.40 per share, for minimum proceeds of $1,000,000.

**The Resulting Issuer**

Upon completion of the Transaction the Resulting Issuer is expected to change its name to "Linear Holdings Inc." or such other name as determined by Linear and the Resulting Issuer is expected to be listed as a Tier 2 industrial issuer under the Exchange's rules.

**Leadership Team**

At the closing of the Transaction, the board of directors will be comprised of the following four directors; Mark Livingston, George Callas, Dan Koziol and Geoff Balderson. Mark Livingston will serve as the Resulting Issuer's chief executive officer, Dan Koziol will serve as the Resulting Issuer's chief marketing officer and Kelly Lenahan will serve as the Resulting Issuer's chief financial officer.

**Mark Livingston – Chief Executive Officer and Director of Resulting Issuer**

Mr. Livingston is experienced in operations, finance, strategic planning, start-up companies, company turnarounds, management information systems and planning for the succession of closely held businesses. He has served as Co-Founder and President of Surfing's New Image, Inc., Founding Partner at accounting firm Campbell Boyd & Livingston, President & Chief Operating Officer at Motels of America, Inc., President at Road Runner Sports, Inc., CEO at Price Quest, Inc., President at Soluciones Technologias de S.A. de C.V., President & CFO at Belstar Systems Corp., President at Sims Snowboards and CEO at Access Properties Group, Inc. just to cite a few of his many endeavors.

Mr. Livingston holds a Bachelor of Science degree in Business Administration from San Diego State University and is a Certified Public Accountant (non-practicing) in the State of California. In addition, Mr. Livingston has participated as a member of the Young Presidents Organization, as an advisory board member for Blanchard Training and Development, as a board member of The Planning Forum and as chairman of The Management Consulting Services committee for the San Diego chapter of the California Society of Certified Public Accountants.

**George Callas – Director of Resulting Issuer**

George Callas is a seasoned accounting, tax and financial services executive. After several years in public accounting, Mr. Callas formed his own CPA firm and developed an impressive list of clients. In 1991, Mr. Callas founded Harvest Farms, Inc., a USDA food manufacturing company where he developed manufacturing processes for unique food products that were distributed nationally to numerous county, state and federal correction facilities, as well as various national retail outlets. With annual revenues in excess of $25 million, the company was merged in 2002 into a new entity, which went on to grow annual revenues to in excess of $100 million by 2007 and be acquired by a private equity investor. Since 2009, Mr. Callas has been an active participant in various start-up and growth companies.

Mr. Callas holds a Bachelor of Science in Business from San Diego State University and is a Retired Certified Public Accountant.

**Dan Koziol – Chief Marketing Officer and Director of Resulting Issuer**

Dan Koziol draws his experience in developing fast-moving consumer goods (FMCG) businesses throughout international markets in Asia-Pacific, North America, and Europe. His experience ranges from brand and marketing management in blue chip companies in Australia as well as a senior market builder as General Manager Sales & Marketing at Sanitarium UK, and as Marketing Director of So Good International (UK), a Dupont Life Sciences company. In 1996 Mr. Koziol took the Australian dairy

EXHIBIT L
PAGE 2 OF 5

alternative brand *So Good* into international markets and developed ingredient licensing to market leadership in North America and Europe while incubating other dairy alternative companies and sponsoring clinical research as chairman of the *International Soy Advisory Board*. In 2001, Mr. Koziol founded *The Big Idea,* a market development agency in London's West End where he was CEO for eight years. During this time Mr. Koziol established and grew major food brands from Australia, South Africa, and New Zealand and represented the Australian government initiative in the EU partnering with mass grocery retailers under *The National Food Industry Strategy.* In 2010, while serving as Senior Vice President of Sales and Marketing with TreeFrog Developments Inc., Mr. Koziol grew the company to over US$200 million in sales. In October 2013 Dan founded *Crowd & Company*, developing companies and products by providing a full management, marketing and sales infrastructure. Mr. Koziol holds a Master of Business Administration from the University of Technology, Sydney.

**Geoff Balderson – Director of Resulting Issuer**

Geoff Balderson has over 20 years of capital market experience. Mr. Balderson is the president of Harmony Corporate Services Ltd., and leads a team that provides bookkeeping, accounting, filing and corporate secretarial services to publicly listed companies. Mr. Balderson is an officer and director of various TSX Venture listed companies. Mr. Balderson is a former Investment Advisor with two Canadian Securities dealers, and a graduate of the University of British Columbia.

**Kelly Lenahan – Chief Financial Officer of Resulting Issuer**

Kelly Lenahan is a result-oriented accounting professional with over 20 years' experience working in many different industries. Ms. Lenahan is well versed working with companies of different sizes, from start-ups to companies with over 800 employees. She has managed many aspects from accounting set up, income tax schedules, payroll, customer billing, general ledger thru producing financial statements, cashflow management, budget and projections, managing cap tables, negotiating contracts, international banking among many other areas. Ms. Lenahan has assisted executives in business planning and development as well as all areas of setting up an office or storefront. She has many years of experience in human resources and employee relations as well as training in several different accounting and payroll platforms. Kelly currently manages the accounting for clients in the biotech/pharma industry, software development and the medical/dental industry.

**Control Persons**

Following the Transaction, the Company will not have a control person (as such term is defined in the Exchange's rules).

**Sponsorship**

The parties are proposing to apply to the Exchange for an exemption from applicable sponsorship requirements.

**Other Matters**

A comprehensive press release with further particulars relating to the Transaction, including, without limitation, information respecting Linear's business, the Resulting Issuer's leadership team and the Private Placement, will follow in accordance with the policies of the Exchange.

Trading in the common shares of the Company has been halted in accordance with the policies of the Exchange. Trading will resume upon the successful closing or abandonment of the Transaction.

A filing statement respecting Linear and the Transaction will be prepared and filed in accordance with the policies of the Exchange.

Linear has supplied all information contained in this news release with respect to Linear and Dynamo and its directors and officers have relied on Linear for any such information.

EXHIBIT L
PAGE3 OF 5

*This press release is not an offer of securities for sale in the United States. The securities described in this press release have not been registered under the U.S. Securities Act of 1933, as amended, and may not be offered or sold in the United States or to, or for the account or benefit of, U.S. persons (as defined in Regulation S under the U.S. Securities Act of 1933, as amended) absent registration or an exemption from registration. This press release shall not constitute an offer to sell or a solicitation of an offer to buy nor shall there be any sale of the securities in any jurisdiction where such offer, solicitation, or sale would be unlawful.*

*Completion of the Transaction is subject to a number of conditions, including but not limited to, Exchange acceptance and if applicable pursuant to Exchange Requirements, majority of the minority shareholder approval. Where applicable, the Transaction cannot close until the required shareholder approval is obtained. There can be no assurance that the transaction will be completed as proposed or at all.*

*Investors are cautioned that, except as disclosed in the management information circular or filing statement to be prepared in connection with the Transaction, any information released or received with respect to the Transaction may not be accurate or complete and should not be relied upon. Trading in the securities of a capital pool company should be considered highly speculative.*

*The TSX Venture Exchange Inc. has in no way passed upon the merits of the proposed Transaction and has neither approved nor disapproved the contents of this press release*

**Neither the TSX Venture Exchange nor its Regulation Services Provider (as that term is defined in the policies of the TSX Venture Exchange) accepts responsibility for the adequacy or accuracy of this release.**

**About Dynamo**

Dynamo is a Capital Pool Company created to identify and evaluate potential acquisitions of commercially viable businesses and assets that have the potential to generate profits and add shareholder value. Except as specifically contemplated in the CPC policy of the Exchange, until the completion of its qualifying transaction, Dynamo will not carry on business, other than the identification and evaluation of companies, businesses or assets with a view to completing a proposed qualifying transaction.

For further information respecting Dynamo, please contact:

Geoff Balderson
Chief Executive Officer and Chief Financial Officer
Telephone: 604-602-0001

**FORWARD-LOOKING STATEMENTS**

Certain statements in this release are forward-looking statements, which reflect the expectations of management regarding the Transaction, the Company's and Linear's future business plans. Readers of this press release should be advised and aware that the Transaction may not occur. These statements and other statements contained in this press release that are not purely historical fact are forward-looking statements, within the meaning of the Private Securities Litigation Reform Act of 1995, that are based on management's beliefs, certain assumptions and current expectations. Wherever possible, words such as "may", "will", "should", "could", "expect", "plan", "intend", "anticipate", "believe", "estimate", "predict" or "potential" or the negative or other variations of these words, or similar words or phrases about the Company's or Linear's market opportunities, future plans and performances, objectives and expectations with respect to future operations and development opportunities have been used to identify these forward-looking statements. Forward-looking statements in this news release include statements relating to the Transaction and its terms. Forward-looking statements involve significant risk, uncertainties and assumptions. Many factors could cause actual results, performance or achievements to differ materially from the results discussed or implied in the forward-

EXHIBIT L
PAGE 4 OF 5

looking statements. These factors should be considered carefully and readers should not place undue reliance on the forward-looking statements. Although the forward-looking statements contained in this press release are based upon what management believes to be reasonable assumptions, the Company cannot assure readers that actual results will be consistent with these forward-looking statements. These forward-looking statements are made as of the date of this press release, and the Company assumes no obligation to update or revise them to reflect new events or circumstances, except as required by law.

EXHIBIT L
PAGE5 OF 5

PAGE 6

# BUSINESS EXPANSION HIGHLIGHTS

**Using the unique business model of management contracts and royalty agreements, UPPR has created the following businesses that we manage and are paid royalties and management fees from:**

**1** Growing Springs/Upper Street is under contract to cultivate 1,200 acres of hemp for 2019 and beyond.  UPPR owns and operates a 100,000 square foot facility for processing Cannabidiol or CBD from the hemp, in Center, Colorado. UPPR will process over 2,000,000 pounds of bio-mass in 2019 and up to 4,000,000 pounds of bio-mass in 2020. Using current pricing for CBD extract this could generate up to a target of $250,000,000 of revenues for in 2019 and a target of up to $400,000,000 of revenues in 2020. The estimated costs for growing the hemp and processing of the CBD oils is approximately 12% of the revenues.

**2** In order to facilitate existing extraction and specialty product needs, UPPR has leased a 12,000 licensed CBD laboratory processing facility in San Diego, CA.  This facility borders UPPR's collaborative pharmaceutical partner, PrimaPharma Inc.

**3** UPPR is also negotiating an additional 7,000 acres of hemp for cultivation in Colorado and other states for 2020 - 2024.

**UPPR: WE TAKE IT HIGHER**  (OTC: UPPR)

EXHIBIT M
PAGE 1 OF 2

**2019**

# A DIVERSIFIED OFFERING OF CANNABIS-BASED SERVICES

*High quality products and services with repeatable and consistent standards and predictable results*

### Design & Planning
We assist commercial agricultural customers in designing systems and planning mass hemp cultivation.

### HIGHER YIELDS
We significantly improve agricultural crop performance and yields.

### Superior Genetics
Growing Springs has secured proprietary and unique AAA cannabis and hemp genetics and seed banks as a barrier to determined competitors



### Less Inputs
Our Liquid Conversion Technology (LCT) processes dramatically reduces amounts of fertilizer and ancillary chemicals needed in agricultural operations.

### No Run-Off
We reduce or eliminate agricultural run-off.

### GHSC - Exclusivity
Our LCT water systems are exclusive to the cannabis and hemp industry.